[Civ. No. 3432.   Fourth Dist.   Dec. 18, 1946.]

DEPARTMENT OF SOCIAL WELFARE OF THE STATE OF CALIFORNIA, Plaintiff and Appellant, v. VERNIE WINGO, as Executor, etc., Defendant and Appellant.

318

■■■■■■■■■■■■■■■■

Robert W. Kenny, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Plaintiff and Appellant.

Alphonse E. Ganahl for Defendant and Appellant.

MARKS, J.—Both parties have appealed from a judgment whereby plaintiff recovered $948 paid F. S. Wingo, deceased, during his lifetime, between May 1, 1938, and January 1, 1940, both inclusive, under the Old Age Security Law. (Welf. & Inst. Code, § 2000 et seq., hereafter called the Code.)

The plaintiff maintains that the judgment should be for double the amount paid deceased under the provisions of section 2223 of the Code, and defendant argues that the evidence is insufficient to support any award against defendant.

Several exhibits were introduced in evidence at the trial. While they are referred to in the briefs they have neither been copied in the record nor have they been transmitted to this court. If counsel do not consider them of sufficient importance to have them before us we see no reason why we should do so. (See rule 5; subd. b, rule 10; rule 52, Rules on Appeal.) We will rely on the statements in the briefs as to the contents of these exhibits.

We will first consider the appeal of the plaintiff where it is contended that it was incumbent on the trial judge to render judgment against defendant for double the amount paid deceased. This argument is based on the theory that the word ''MAY'' in section 2223 of the Code must be construed as meaning ''must.''

Section 2223 of the Code provides as follows:

''If, on the death of a recipient of aid under this chapter, it is found that he was possessed of property or income in excess of the amount allowed under the provisions of this chapter and that he has not disclosed the same to the board of supervisors, double the amount of the aid paid him in excess of that to which he was legally entitled may be recovered by the Department of Social Welfare as a preferred claim from his estate. . . .''

Section 15 of the Code provides that " 'Shall' is mandatory and 'may' is permissive." "When the meaning to be given to particular terms is prescribed by the Legislature in enacting a statute, that meaning is binding upon the courts." (*B. P. Schulberg Productions, Ltd.* v. *California Employment Commission,* 66 Cal.App.2d 831 [153 P.2d 404].) (See, also, *In re Monrovia Evening Post,* 199 Cal. 263 [248 P. 1017]; *Rideaux* v. *Torgrimson,* 12 Cal.2d 633 [86 P.2d 826].) These authorities seem to settle this argument so it is unnecessary to review in detail the cases cited by plaintiff.

Although this code section and these cases dispose of this contention of plaintiff, there is another compelling reason why this argument cannot be sustained. Although it was not raised in the trial court and is not stressed in the briefs it is too important to be overlooked especially since the case must be tried again.

Section 2223 of the Code is penal in its nature and provides a penalty to be placed on the estate of a person who has, in effect, concealed some of his assets and obtained aid illegally. This section was enacted in 1937 (Stats. 1937, p. 1185), and has remained substantially in the same form ever since.

Section 2223.5 of the Code was enacted in 1943 (Stats. 1943, p. 1592) after the death of deceased, but before the trial of this case when it was in full force and effect. It provides as follows:

"Notwithstanding the provisions of sections 2222 and 2223, a person who has received aid in good faith, honestly believing himself to be entitled thereto, but who is found to have possessed property in excess of the amount allowed under the provisions of this chapter, shall be considered to have been ineligible for aid only during the period for which the excess property, if it had been applied to his support at the rate of the aid granted to him, would have supported him. In such case the recipient shall repay only the aid he received during such period of ineligibility."

While section 2223.5 did not by its express terms amend section 2223 it cannot be doubted that in effect it was an amendment and modification of that section by reducing the penalty that might be imposed where aid was obtained by a recipient honestly and in good faith.

The important question confronting us is this: Should the provisions of section 2223.5 of the Code which was not in effect when the aid was received by deceased but was in effect

during the trial of this case have been considered by the trial judge as an amendment or modification of section 2223 of the Code in effect at the time of trial and establishing the law governing its decision? Under the rules announced by the California courts we believe the answer must be in the affirmative.

It is the general rule here that where a cause of action unknown at the common law has been created by statute and no vested or contractual rights have arisen under it the repeal of the statute without a saving clause before a judgment becomes final destroys the right of action. The same rule is applied to an amendment of a statute. (*California Employment Commission* v. *Arrow Mill Co.*, 45 Cal.App.2d 668 [114 P.2d 727].)

The law on the question was ably summed up by Mr. Presiding Justice Peters in *Lemon* v. *Los Angeles T. Ry. Co.*, 38 Cal.App.2d 659, at page 669 et seq. [102 P.2d 387], as follows:

"In addition, it is our opinion that the repeal in 1937 of the statute of 1880, *supra,* without a saving clause, and the amendment of section 468 of the Civil Code in the same year, constitute a complete bar to the cause of action here involved. . . . It is true, of course, that the repeal of the statute in 1937 could not affect vested rights. But the rights of appellant were not vested. No person has a vested right in an unenforced statutory penalty or forfeiture. (*Moss* v. *Smith* [171 Cal. 777 (155 P. 90)]; *Anderson* v. *Byrnes,* 122 Cal. 272 [54 P. 821].) For these reasons it has been held in a long line of cases that the repeal of a statute creating a penalty, running either to an individual or the state, at any time before final judgment, extinguishes the right to recover the penalty. The same rule applies to remedial statutes unknown to the common law. (Citing cases.) The Supreme Court of this State, in a decision rendered since the filing of the briefs herein, has recently reviewed many of these cases in holding that a right or remedy unknown to the common law and dependent entirely on a statute is extinguished by the repeal of the statute. (*Southern Service Company Ltd.* v. *County of Los Angeles,* 15 Cal.2d 1 [97 P.2d 963].) The rule is clearly stated at page 11 as follows: 'The legislature may withdraw such a statutory right or remedy, and a repeal of such a statute without a saving clause will terminate all pending actions based thereon.'. . . ' "If final relief has not been granted before the repeal goes into effect it cannot be granted afterwards, even if a judgment has been entered and the cause is pending

on appeal. The reviewing court must dispose of the case under the law in force when its decision is rendered.'' ' ''

These rules find further support in the following cases: *Los Angeles etc. Transp. Co.* v. *Superior Court,* 211 Cal. 411 [295 P. 837] ; *Penziner* v. *West American Finance Co.,* 10 Cal.2d 160 [74 P.2d 252] ; *Southern Service Co. Ltd.* v. *County of Los Angeles,* 15 Cal.2d 1 [97 P.2d 963] ; *International etc. Workers* v. *Landowitz,* 20 Cal.2d 418 [126 P.2d 609] ; *California Employment Commission* v. *Arrow Mill Co., supra;* and *Western etc. Lmbr. Co.* v. *California Employment Commission,* 58 Cal.App.2d 403 [137 P.2d 76].

██ It is clear that section 2223 of the Code created a cause of action unknown to the common law which was penal in its nature and that no right to the penalty had vested when this action was tried. There was no saving clause in the later statute. It follows that the provisions of section 2223 of the Code, as modified and amended by section 2223.5 of the Code, should have governed the trial court in its decision of the case and must govern us here.

Section 2223.5 of the Code provides that in cases where the recipient of aid had acted honestly and in good faith the double penalty could not be imposed. This is an added reason for holding that at the time of trial the provisions of section 2223 of the Code were directory and not mandatory. It follows that the appeal of the plaintiff is without merit.

██ We must next turn to the appeal of defendant where it is urged, among other things, that there is no evidence to support the finding to the effect that deceased owned and had in his possession personal property and money in excess of $500; that plaintiff had no legal capacity to sue; that the trial court erred in excluding evidence offered to show the good faith of deceased in applying for and receiving aid. The arguments of counsel on the first question center around the value of two promissory notes given deceased by his daughters and sons-in-law. No question is raised concerning his real estate.

Deceased left a will, executed in April, 1938, in which it was provided that: .

''I have also loaned money in various amounts to some of my surviving children. Any indebtedness to me on account of such loans remaining unpaid at the time of my death shall either be paid to my executor or shall be charged off against

the distributive shares of the child or children so indebted to me."

The evidence of value of the personal property owned by deceased which must be relied upon to support the finding to the effect that deceased possessed personal property of a value of more than $500 is indeed meager. It consists of the inventory and appraisement of the property of deceased, the testimony of Jesse Wells, manager of the Arlington Branch of the Citizens Trust and Savings Bank of Riverside (hereinafter called the bank), and that of Frank Burchfield, County Assessor of Riverside County, as to the assessed value of property assessed to William and Mary Flossie Butcher, husband and wife.

The inventory and appraisement was introduced in evidence without objection so it is before us for consideration. It shows the following personal property:

"Money on hand and in bank ................$280.13
  Furniture and household goods ............. 100.00
  Promissory note, dated April 29,
    1938, made by Wm. and Mary
    Butcher, payable on demand .............. 756.00
  Promissory note, dated April 28,
    1938, made by Hildreth and
    Clyde Story, payable on demand ........... 677.10
  Account receivable from H. Wingo .......... 125.00"

His personal property was of an appraised value of $1,938.23, which is in excess of the amount of $500 permitted to a recipient of aid during the time in question here. (§ 2163 of the Code, as in effect 1938-1941.)

The weakness and unsatisfactory nature of an inventory and appraisement as evidence of value in fixing the fees of an administrator is discussed at length in *Estate of Fernandez,* 119 Cal. 579 [51 P. 851].

There is no evidence before us as to when money in the sum of $280.13 was acquired or how long deceased had that amount of money prior to his death other than stipulations that on May 1, 1938, he had a bank balance of $68.40; that he had a maximum bank balance of $152.50 that year, and that in 1939, his bank balance ran as follows: $187.50, $189.20, and $191.09. We, therefore, cannot charge deceased with having $280.13 in money during the entire time he received aid.

There is evidence in the record that deceased acquired his

household goods and furniture in the middle nineteen twenties and that they had a value of $100, so this sum must be included in our calculations of the value of his personal property. Section 2163.2 of the Code was not passed until 1943. (Stats. 1943, p. 1586.)

There is no evidence in the record before us concerning H. Wingo, his financial responsibility or the value of his indebtedness to deceased other than the inventory and appraisement. Nor does it appear when the debt was created.

Mary Flossie Butcher was the daughter of deceased and the wife of William Butcher. About 1928, deceased loaned them $1,000, of which sum they repaid something over $200 prior to the end of 1931. Thereafter, they paid him nothing because, as they both testified, they could not do it as they did not have the money. When deceased executed his will the indebtedness of his children to him was discussed and it was decided that his daughters with their respective husbands execute notes for the unpaid portion of the debts which had been barred by the statute of limitations so that on distribution of the estate the shares of the distributees could be equalized. In the will it was provided that the debts, if not paid, could be treated as advancements to the two daughters.

Mr. Jesse Wells had been manager of the bank since 1933. He knew Mr. and Mrs. Butcher who had been customers of the bank both as borrowers and depositors. As far as the record discloses he did not know Mr. and Mrs. Story. Mr. Wells testified as an expert on the value of at least the Butcher note, as follows:

"Q. Do you see these two notes—— this one executed by William Butcher and Mary F. Butcher, dated April 29, 1938? In your opinion, during the period 1938 and 1939 would you consider that a good note? . . . The Court: Ask him if he knows the value. Q. (Miss Palmer) Do you know the value of that note, Mr. Wells? A. Well, I am presuming it is a legal note. I haven't read it through. I would answer it this way: That if Mr. Butcher and Mrs. Butcher at that time had applied for a loan in our bank, I think they would have gotten it. The Court: Can't you put it as a direct answer to the question as to whether, in your opinion and knowledge of the facts, you know the value of those notes at that time? Just your opinion? A. My opinion would be yes. Q. (Miss Palmer): Yes, as to the full amount? A. Yes."

He further testified that the bank loaned Mr. and Mrs. Butcher $1,200 in 1939; that he did not check into their mortgages or other obligations; that later the same year the loan was increased to $3,000; that "Q. As a matter of fact, didn't you know at that particular time he was almost insolvent? A. Apparently, because we took security on that particular note. Q. Because he was almost insolvent? A. Well, I won't say that. Q. Apparenty insolvent? A. Times were rather tight, I think, along about that time. Q. Was that a mortgage on cattle? A. Yes. Q. The bank took a mortgage on the cattle that Mr. Butcher had? A. Presumably, yes, and horses."

The county assessor of Riverside County testified as to the assessed valuation of the property of Mr. and Mrs. Butcher. He knew nothing about their obligations, secured or unsecured. He testified that the assessed valuations represented about one-half of the actual value of their properties. He gave the following assessed valuations, first appearing the year, second the assessed value of the real estate, and third, the assessed value of the personal property: 1938, $4,430, $410; 1939, $5,330, $940; 1940, $5,170, $340.

Mr. Butcher testified that he was a farmer; that the last money paid deceased was in 1931; that thereafter he paid nothing because "I didn't have the money"; that both his real estate and personal property were mortgaged. Mrs. Butcher corroborated her husband. She further testified that at all times after May, 1938, she and her husband were in debt, not considering their note to deceased as a debt; that they could not pay the note to deceased; that she and her husband were on the point of insolvency during the period involved here; that some of the interest accruing during that time had not been paid at the time of trial, February 11, 1944.

The debt of Mr. and Mrs. Story to deceased was created in 1928, and their note was executed in April, 1938. There was no evidence as to the assets and total liabilities of Mr. and Mrs. Story and no evidence except their own on the question of their ability to pay their note.

Mrs. Story testified that in 1938 she and her husband owed about $5,500 other than the note to deceased; that their property was mortgaged; that they still were in debt in 1944; that they could not pay their note to deceased. Mr. Story corroborated the testimony of his wife. He added that in 1938 their financial condition "was pretty bad. I was behind on

my taxes, and practically through"; that he was a farmer and could pay deceased nothing on the note.

It should be noted here that the foregoing evidence of Mr. and Mrs. Story stands uncontradicted and that plaintiff made no effort to prove that they were able to pay their note to deceased before his death or that they had any assets that could be subjected to that purpose.

Thus the only evidence as to the value of the two notes is the very uncertain testimony of Mr. Wells, that of the assessor as to the assessed valuation of the Butchers' property, and the inventory and appraisement. If the testimony of Mr. Wells can be construed as meaning that the Story note was worth its face value, it is too unsubstantial to create a conflict in the evidence. As we have already observed, it does not appear that he either knew Mr. and Mrs. Story or had any knowledge of their financial condition. Such an expressed opinion (if he intended to express one as to Mr. and Mrs. Story, which is very doubtful) becomes mere speculation without anything on which to base it.

Too much weight cannot be given to the values given the notes in the inventory and appraisement under the circumstances here shown. The will provided that the notes could either be collected or treated as advancements to the two daughters. Thus, regardless of their value and collectibility during the lifetime of deceased, they became of full face value to the estate at the moment of death. If not paid in money, the total sums would be collected by charging them as advancements against the distributive shares of the daughters in the estate. Under these circumstances, it was proper to appraise the notes at full value, and such an appraisement can throw little light on the value of the notes during the lifetime of deceased, which is the controlling question here.

To sum up, we must reject the Story note from consideration as an asset of deceased, as there is no substantial evidence that it had any value prior to his death. Giving to the balance of the personal property the full value contended for by plaintiff, even including the very questionable H. Wingo debt, we have the following:

| | |
|---|---:|
| Furniture and household goods | $100.00 |
| Butcher note | 756.00 |
| Accounts receivable from H. Wingo | 125.00 |
| | $981.00 |

To this must be added an amount of money which varied from $68.40 on May 1, 1938, to $280.13 at the time of death, as shown in the inventory and appraisement. This would show a variable value of personal property ranging from $1,049.40 to $1,261.13. This is assuming that the H. Wingo accounts receivable were unpaid on May 1, 1938, and were collectible, which the evidence fails to show. Section 2223.5 of the Code provides that, assuming good faith and honesty of deceased, he would be considered to have been ineligible for aid during the period for which the *excess property*, if applied to his support, would have supported him. This *excess property* is determined by deducting the allowable $500 from the total assumed value of the personal property which leaves a variable amount ranging from a minimum of $549.40 to a maximum of $761.13, which could have been applied to support. This is assuming but not holding that all contentions of plaintiff are correct and find sufficient evidentiary support except as to the Story note. These sums are less than the $948 overpayment found by the trial court, for which judgment was rendered.

As to the question of the honesty and good faith of deceased, the record fails to present sufficient facts to overcome the presumptions of innocence of crime or wrong set forth in section 1963 of the Code of Civil Procedure.

The Old Age Security Law was passed with the benevolent intent of preventing suffering and want on the part of the needy aged, and to help furnish them the necessaries of life such as food, clothing and shelter. These things usually are not subject to barter, so the value of the personal property of a recipient of aid should be the amount of money that could be obtained for it. In *Babbitt* v. *Read*, 236 F. 42 [149 C.C.A. 252], the term was defined as follows: " 'Value' is what the thing will bring today in exploitation or exchange under some presently possible conditions."

While the fact that the makers of a promissory note could not pay it at any particular time may be an important element of proof of its value, such evidence of itself does not conclusively establish that the note had no value. The financial condition of the makers might change so that a purchaser of the securities might be found. If a note was not collectible, as appears to be true in the case of the two notes involved here, it might be endorsed by the payee without recourse and sold at a discount. If this could be done, it would

be one way of establishing the value of the note. This should be borne in mind on a retrial of the case when the market value of the personal property of deceased at various material times should be established by competent evidence.

Defendant argues that plaintiff had no legal capacity to sue. There is no merit in this contention because section 2223 of the Code provides that it may bring the action.

Defendant argues that the trial court erred in excluding evidence offered by him. The record indicates that this evidence had a bearing on the good faith and honesty of deceased in applying for and receiving aid. Therefore it had a material bearing on an issue in the case and should have been admitted.

We have reviewed the other questions argued by defendant and do not consider that they possess sufficient merit to require particular discussion.

It seems clear that the evidence does not support the judgment in its full amount nor does it disclose the proper amount that plaintiff is entitled to recover, if anything.

The judgment is reversed. Defendant will recover costs of appeal.

Barnard, P. J., and Griffin, J., concurred.