[Crim. No. 7438.    Second Dist., Div. One.    July 6, 1961.]

THE PEOPLE, Respondent, v. FLORENCE AADLAND, Appellant.

Burton Marks for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

LILLIE, J.—Defendant was accused by information, containing five counts, with the offense of contributing to the delinquency of a minor (Welf. & Inst. Code, § 702). The minor was defendant's unmarried daughter, age 17 at the time of the events set forth in the accusatory pleading.[1] The information alleged that defendant permitted the minor to use and consume intoxicants (Count I), exposed herself in an intoxicated condition before the minor and did at such time drink intoxicants in the minor's presence (Count II), engaged in an act of sexual intercourse while the minor was present (Count III), permitted the minor to use a bed with a male person (Count IV), and permitted said minor to engage in sexual intercourse with a named male person (Count V), all of which acts tended to cause the minor to lead an immoral life. Count V was dismissed following a motion under section 995 of the Penal Code. Thereafter, each remaining count (except Count I) was amended to read that it was a different statement of the same offense set forth in Count I. Trial by jury having been waived, it was stipulated that the cause be submitted on the transcript at the preliminary hearing. No additional testimony was presented. The court found defendant guilty as charged, and she appeals from the judgment of conviction.

It is not now contended that the facts adduced by the prosecution, if legally corroborated, do not sufficiently support

---

[1]Immediately prior to the filing of the criminal complaint herein, a separate proceeding was instituted to have the minor declared a ward of the juvenile court (Welf. & Inst. Code, § 700); as a result, her custody was taken from her parents.

the judgment—no defense testimony was forthcoming at the preliminary hearing; however, in addition to the claim that she was convicted on the uncorroborated testimony of accomplices (Pen. Code, § 1111), defendant maintains that she was not legally committed for trial in the superior court and that she was denied due process of law in certain particulars hereinafter set forth.

Some of the salient facts must be recounted to dispose of the claim that the testimony of asserted accomplices was not corroborated in accordance with the statute (Pen. Code, § 1111). Ronnie Shedlo testified that on March 19, 1960, he went to the beach with the minor, Kenneth and Bill Stancieu, and a sailor named Quinlin. Later, they proceeded to defendant's apartment where they found the defendant in the company of Bob Profeta and Lee Dimon; all three were drinking wine and, according to Shedlo, the defendant was intoxicated. The minor went into the bathroom and changed into a shortie nightgown; she then rejoined the group, and everybody stood around talking and drinking wine for about three hours— from 7 p. m. to 10 p. m. During this latter period, the record reveals, defendant engaged in an act which is the subject of Count III of the information; as a prelude thereto, defendant permitted her private parts to be fondled by her male companion in the presence of the minor who became "hysterical" and went into the bathroom. In addition to Shedlo's testimony, the events of the evening were testified to by Dimon, Profeta and Stancieu; all three were of the opinion that defendant was intoxicated; and each described the sexual act. Dimon further testified that he saw the defendant about 20 times that same month and "most of the time . . . she was under the influence." Profeta also described an incident one week prior to March 19 when the minor, wearing a bathrobe with "absolutely nothing on underneath," was permitted to occupy a bed with a male adult (Count IV).

Photographs were taken by male participants of certain of the events on the evening of March 19 and were received below as exhibits. On application of the attorney general, they have been transmitted to this court (rule 10(b), Rules on Appeal), and the record has been augmented accordingly (rule 12(a), Rules on Appeal). Some of these photographs admittedly were "posed," while others were not. The motives of the individual photographers were explored on cross-examination; innocent or otherwise, as will presently be

pointed out, they are not the determining factor in the result we reach as to this phase of the appeal. Certain of the photographs depict a fracas between defendant and her daughter—one shows the minor, clad in her shortie nightgown, holding a bottle of wine—which climaxed the evening and resulted in the summoning of the police.

Upon the trial, it was stipulated that the police would testify in accord with the arrest report filed approximately four hours later. This report, which was incorporated into the record, discloses that the officers proceeded to the vicinity in question upon complaint of a neighbor who "heard a woman screaming across the street"; upon being admitted to defendant's apartment, they observed that it was "strewn with clothing, empty beer and wine bottles, cigarette butts and ashes . . ." After defendant and the persons then present (Profeta, Dimon, Shedlo and Quinlin) had identified themselves, the officers investigated the cause of the screaming and were told by Profeta that the defendant had "started shouting and screaming" when she called for the minor and the minor did not answer. It further appears that when one of the officers was using the phone (as part of the investigation), defendant "sat up in bed and yelled: 'Your [*sic*] all [obscenities], you policemen and everybody else in this damn place is just a bunch of free-loaders. I don't know why in hell B. [the minor] let you jerks come around here. Your [*sic*] young punks. I taught her to go out with older rich men but she won't listen any more. She's just a young brat, I wish she would get the hell out, and take her God damn freeloading friends with her.'. . ." When the minor returned to the apartment, she said to her mother: "You've been drinking and drunk for three weeks." Defendant then said: "You damn brat, get these [obscenities] out of her [*sic*]. You're always causing trouble." The minor replied: "Me, causing trouble. How about that slapping me and pulling my hair tonight." The officers then intervened. Later according to the police report, the minor said: ". . .'she gets like this whenever there's any alcohol around. Ever since Errol died, she thinks she can run my damn life. I spent two years going all over the world on my own with Errol, and when he died she stepped in and tried to get everything she could.'. . ."

The governing statute provides that an accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given" (Pen. Code, § 1111). █ If

the undisputed evidence establishes that a witness is an accomplice, the jury should be so instructed, but if the facts as to complicity are in dispute, the question should be left to the jury.'' (*People* v. *Santo*, 43 Cal.2d 319, 326 [273 P.2d 249].)　　　A rather strong argument for complicity is made in this case; however, ample corroboration of prosecution testimony is found in the photographs and police report. It is not suggested that the photographs do not accurately depict the scenes described by the various witnesses; as for the police report, the officers were obliged to referee an argument between defendant and the minor from which unfavorable inferences could reasonably be drawn with respect to defendant's drinking habits and her apparent approval of the minor's prior social activities with an undivorced older man.　　　It has been repeatedly declared that the corroborating evidence is sufficient if it tends to connect the defendant with the commission of the offense in such a way as may reasonably satisfy the trier of fact that the witness who must be corroborated is telling the truth. (*People* v. *MacEwing*, 45 Cal.2d 218, 224 [288 P.2d 257] and cases there cited.)　　　We have no doubt that this test was met in the case at bar; furthermore, defendant's failure ''to deny or explain evidence presented against him, when it is in his power to do so, may be considered by the jury as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable.'' (*People* v. *Adamson*, 27 Cal.2d 478, 489 [165 P.2d 3].)

　　　Next, it is contended that defendant ''was not legally committed in that the prerequisites of Section 726 of the Welfare and Institutions Code were not complied with.'' The first paragraph of that section provides that upon the filing of a petition against a juvenile under section 700 of the same code, a citation shall issue directing the parent, guardian or other person having custody and control of the minor concerned to appear at the time and place for which hearing of the petition has been set; as amended in 1949, it is therein further provided as follows: ''or a citation may issue to such parent, guardian or other person directing him to appear at such time and to show cause why a complaint should not be filed against him charging him with a violation of Section 702 of this code.'' The instant record, defendant points out, is devoid of any service of the citation mentioned in the 1949

amendment; therefore, she argues, the prosecuting attorney was without jurisdiction to issue a complaint against her, and the juvenile court in turn was without jurisdiction to hear evidence on the complaint, and hence her commitment was illegal and void. Although defendant concedes that there is no authority in support of this contention, she nonetheless maintains that no authority has been found in derogation thereof.

As originally enacted in 1937, section 726 apparently made no provision for any showing by the parent or person having custody why a contributing complaint (Wel. & Inst. Code, § 702) should not be issued; thus, in 1937 the first sentence of the statute read as follows: ''Upon the filing of the petition, a citation shall issue, requiring any person having the custody or control of the person alleged to come within the provisions of Section 700, to appear with the minor at the time and place stated in the citation.'' Although there were amendments in that same year and again in 1941, in 1945 there appears the first provision relating to filing of charges under section 702; in that year (1945) the following words were added to the first sentence of the first paragraph: ''and to show cause why a complaint should not be filed against him charging him with violation of Section 702 of this code.'' In 1949, as noted above, the concluding portion of the first sentence was again amended to read: ''or a citation *may* issue to such parent, guardian or other person directing him to appear at such time'' and to show cause why a complaint should not be filed against him, charging a violation of section 702 (emphasis added).

Section 15 of the Welfare and Institutions Code declares that ''shall'' is mandatory and ''may'' is permissive. ''When the meaning to be given to particular terms is prescribed by the Legislature in enacting a statute, that meaning is binding upon the courts.'' (*Department of Social Welfare* v. *Wingo*, 77 Cal.App.2d 316, 319 [175 P.2d 262].) The intention of the Legislature that the term ''may,'' as used in section 726, was meant to be permissive is further demonstrated by the 1949 amendment which substituted certain language in the section as then and there worded; as previously pointed out, in 1945 the section provided that a citation ''*shall* issue'' directing the parent or other person to appear at the time and place designated ''*and* to show cause'' why a complaint should not be filed against him under section 702 (emphasis added). Illustrative of the wisdom of this change in the law, instances could well be envisaged where the filing

of a petition under section 700 would be quite in order even though the parent was wholly blameless in the premises—the minor, for example, might be "destitute" (§ 700, subd. (c)) through no fault of his parent, or "insane, feeble-minded, or so far mentally deficient that his parents or guardian are unable to exercise proper parental control" (§ 700, subd. (*l*)).

Defendant has cited *In re Moilanen,* 104 Cal.App.2d 835 [233 P.2d 91], for the asserted proposition that "service of a citation, at least as to the notice of the hearings, upon the guardian or parent is jurisdictional." That case was not concerned with the possible issuance of a complaint charging a violation of section 702; it does, however, properly hold that parents are entitled to notice of hearings in proceedings instituted for the *sole* purpose of separating children from their custodians, natural or court-appointed. Here, of course, it is not suggested that defendant was without notice of the first hearing in juvenile court following the taking of the minor into custody; the record in that proceeding shows that defendant was present with her attorneys, at which time the matter was continued without objection to a fixed future date, defendant thereby waiving any insufficiency in that respect as a jurisdictional requirement. (*In re Etherington,* 35 Cal.2d 863, 867 [221 P.2d 942].)

In this connection, it is appropriate to point out that the purposes of the Juvenile Court Law are two in number. Its main purpose is to provide for the care, custody and maintenance of dependent and delinquent children "who have shown, or who from lack of care are likely to develop, criminal tendencies, in order to have them trained to good habits and correct principles." (*Nicholl* v. *Koster,* 157 Cal. 416, 419 [108 P. 302].) The second purpose is to provide for " 'the punishment of persons responsible for, or contributing to, the dependency or delinquency of children.' " (*Matter of Maginnis,* 162 Cal. 200, 204-205 [121 P. 723].) In the last-cited case, the court went on to say: "It needs no argument to show that the existence of dependent or delinquent children is detrimental to the best interests of the community. Ultimately, of course, the act seeks to prevent such dependency or delinquency. One method of doing this is to take the child out of the custody of the person who has caused or permitted it to become dependent or delinquent. Another is to punish the person who is responsible for the condition which is sought to be cured. Both methods are directly related to the final

purpose of protecting the growing generation from conditions detrimental to its welfare'' (p. 205). ■ The present proceeding, it seems clear, was essentially punitive in nature; with good reason it was felt that the aggravated circumstances at bar not only required that defendant should be deprived of the custody of the child whose delinquency she had caused, but also that she should be punished for the condition sought to be cured by the custody change; with good reason it was likewise believed that nothing would be served by the issuance of a citation as a condition precedent to the action contemplated. Proper consideration of this dual approach to the problem convinces us, in addition to the reasons already stated, that a parent charged with contributing to her child's delinquency does not necessarily have the right to two preliminary hearings before she may properly be committed for trial in the superior court, and that in effect is what defendant is now contending. We decline to interpret a statute that will lead to such absurd, as well as burdensome, results.

■ Defendant also contends that she was denied due process of law at the time of the preliminary hearing and that as a result she was illegally committed for trial. The background to this claim reveals its lack of merit. On April 10, 1960, the minor was taken into custody and detained at the juvenile hall; two days later (April 12), a petition was filed under section 700 of the applicable code. On April 14, 1960, a criminal complaint was filed against the defendant, charging violations of section 702; she was arraigned, and preliminary hearing set for April 25. Prior thereto, on April 19, it was disclosed to the public through the metropolitan press that certain incriminating tape recordings were in the possession of prosecution officials which would tend to support the petition against the minor and the charges against defendant. The following day (April 20) defendant's counsel was denied access to the recordings by the prosecution. On April 21, defendant sought to visit her daughter at the juvenile hall, but was denied any access to the minor by the officials in charge. On April 22, defendant's counsel applied to this court for a writ of habeas corpus and a writ of prohibition (in the alternative) commanding the juvenile court to make appropriate orders in the premises; on May 2, an alternative writ of prohibition issued, returnable May 12, restraining further proceedings unless defendant was permitted reasonable access to the minor and afforded an opportunity to hear and copy the recordings referred to in the petition. Meantime, and

before the issuance of the alternative writ, defendant's preliminary hearing had been held and concluded. On May 3 (the day after the alternative writ was issued), the juvenile court directed the inspection of the recordings and also ordered that defendant and the minor be permitted to confer, although it had during the course of the preliminary hearing denied motions to that end by defendant's counsel.

It is now argued that as a result of the committing magistrate's failure to allow defendant access to the recordings and to the minor, "proper cross-examination of the witnesses was curtailed" resulting in a denial of due process; furthermore, according to defendant, since the matter was submitted upon the proceedings at the preliminary hearing, it must be assumed that either the trial court adopted the rulings and orders of the committing magistrate, or that the motion under section 995 of the Penal Code was wrongfully denied.

It is true that the preliminary proceeding is subject to limited appellate review after judgment (*People* v. *Elliot,* 54 Cal.2d 498, 503 [6 Cal.Rptr. 753, 354 P.2d 225]), although the court in that case recognized that the commitment will not be set aside "merely because there has been some irregularity or minor error in procedure in the preliminary examination" (pp. 502-503). Conceding that pretrial production of material in the hands of the People is based on the principle that the defendant is entitled to a fair trial (*Cash* v. *Superior Court,* 53 Cal.2d 72, 75 [346 P.2d 407]), it has nevertheless been pointed out that, "The value to defendant of seeing the statements made by the witnesses is that to do so might enable him to impeach their testimony *at the trial*" (emphasis added). (*Tupper* v. *Superior Court,* 51 Cal.2d 263, 265 [331 P.2d 977].) The record ,is clear that a period of approximately three months elapsed from the production of the recordings (pursuant to the alternative writ) and the date of trial, at which time defendant stipulated that the cause be submitted on the transcript of the preliminary examination and further stipulated that no additional testimony would be introduced. No reason appears, and none is suggested, for defendant's failure to avail herself of the material theretofore made accessible; and we must assume that if the material was possessed of any intrinsic worth, she certainly would not have hesitated to make use of it.

The stipulation just mentioned is significant for another reason. Since defendant obtained the recordings well in ad-

vance of the trial, the only possible area of injury to her lies in respect to the one witness (Shedlo) who announced that he was leaving for New York—the trustworthiness of the other witnesses could have been tested by cross-examination at the trial. As to Shedlo, who announced his intention to leave the jurisdiction, the record does not reveal that he actually left or was unwilling to return. Assuming his absence, his testimony (from the preliminary examination) could not have been used without a proper foundation; if the People had withheld cross-examination material, the argument might well have been made that no opportunity had been furnished for full cross-examination. Nevertheless, defendant stipulated to the use of his testimony, agreed to the production of no further evidence and even waived her right to strike it. She even failed to object to the legality of the commitment at the trial; in *People* v. *Elliot, supra,* 54 Cal.2d 498, the court pointed out that the defendant there had protected her position at each and every stage of the proceeding.

As for the claim that the trial court "adopted" the assertedly erroneous rulings of the magistrate, it was wholly unnecessary for it to review such rulings since defendant had already had access to the tape.

■ With respect to the denial of access to the minor, the situation is similar to that involving the recordings. The record shows that defendant was allowed a visit with her daughter on May 9, 1960 (Mother's Day), although there was an admonition by the court that the present case was not to be discussed; defendant otherwise had full access to the witness well in advance of the trial, and her counsel not only interviewed her daughter several months before trial but had the opportunity to talk with her further at any time thereafter, before trial. The problem, however, of the right of access at or about the time of the preliminary hearing is complicated in view of the peculiar situation at bar. Pending at that time was a proceeding involving the care and custody of the minor; indeed, that matter was presided over by the same judge who presided as a committing magistrate in the present action. True, a defendant has the right to call persons as witnesses and to determine by interview the nature of their testimony (*Walker* v. *Superior Court,* 155 Cal.App.2d 134, 139-140 [317 P.2d 130]); but these rights must sometimes be limited by the rights of others. In *People* v. *Terry,* 180 Cal.App.2d 48, 55 [4 Cal.Rptr. 597], we had occasion to observe that "the first concern of the juvenile court is the

welfare of the minors within its jurisdiction, and such concern should not be sacrificed for other functions of the state, however proper they may be.''

In view of the relatively slight restriction imposed by the juvenile court as committing magistrate which does not appear to have materially hampered appellant in the preparation of her defense, and since the temporary separation of mother and daughter was no doubt dictated by considerations not before this court, we conclude that no abuse of discretion has been shown which would warrant a reversal of the judgment appealed from.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied July 18, 1961, and appellant's petition for a hearing by the Supreme Court was denied August 30, 1961.