[Crim. No. 3629.    Third Dist.    June 15, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. OSCAR JOR-DAN PARKER, Defendant and Appellant.

Robert Carl Anderson, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

FRIEDMAN, J.—Defendant Oscar Jordan Parker was indicted upon a count of grand theft, charging that he defrauded West Coast Savings and Loan Association of $373,600 by a false and fraudulent representation. A jury found him guilty. He appeals from the judgment.

Defendant was a building contractor. In 1957 he entered the residential subdivision and development business in the Sacramento area. Most of his financing was supplied by West Coast Savings and Loan Association, of which Robert G. Joseph was president, manager and a member of the board of directors. West Coast was a wholly owned subsidiary of Great Western Financial Corporation, a concern which maintained its headquarters in Los Angeles. West Coast had a Sacramento board of directors, but it appears that this was largely a figurehead board which possessed little if any control.

Parker's subdivision operations expanded greatly between 1957 and 1960. By the middle of 1960 he was operating five separate subdivisions. In terms of amounts borrowed, he was the largest customer of West Coast Savings and Loan Association. Joseph as president of West Coast was largely responsible for that institution's loans to Parker. During the latter part of 1960 Parker's financial position deteriorated. He owed West Coast approximately $7,000,000, secured by deeds of trust on his various subdivisions. He owed other creditors approximately a million dollars. His assets, consisting of completed and partially completed houses, improved and unimproved building properties, were heavily encumbered or represented by thin equities. He lacked working capital. In December 1960 creditors were threatening to file builders' liens on his subdivisions. A series of creditors' meetings ensued, at which Parker sought time to convert some of his assets into cash. Joseph participated in these meetings. He told the creditors that West Coast was giving Parker time to work out his affairs and suggested that they do likewise.

At that time Parker was negotiating with one Robert Manley, a dealer in second trust deeds. Parker arranged to sell second trust deeds to Manley in order to realize some cash.

He made out a "package" of second trust deeds covering completed and incompleted houses and even some building lots on which no construction had started. Second trust deeds on parcels unadorned by construction were euphemistically termed "manufactured' trust deeds. The package of second trust deeds, aggregating $682,000 in face amount, was delivered to Manley. In exchange for the trust deeds Parker received not cash but a promissory note signed by Manley and his wife. According to Parker's later testimony, the promissory note was merely an interim arrangement while Manley was arranging for loan advances against the trust deeds.

At that stage of his affairs Parker and Joseph discussed the former's expectations of cash from Manley. Joseph had some expectation that Manley's second trust deed financing would supply Parker enough cash to hold off the most pressing creditors and permit Parker to stay in business. Parker had been buying some unimproved land in sections for piecemeal development. He was late in paying for a particular section and the landowner was threatening forfeiture. Parker and Joseph decided that this section of property would now be developed as a 29-lot subdivision called "Highlands Estates No. 2" with new financing supplied by West Coast. West Coast's loan would permit Parker to pay off the landowner and construct 29 houses. The financing arrangement followed an established pattern. Parker and West Coast executed master agreements by which the latter would make construction loans to Parker aggregating $373,600. The loans would be secured by individual trust deeds on the 29 parcels comprising Highlands Estates No. 2. The loan on each parcel was either $12,400 or $13,400. One thousand one hundred fifty dollars of each individual lot loan would be released on recordation and would be paid to the original landowner through a title company. The remainder of the loan proceeds would be disbursed to the borrower in five equal installments at specified stages of home construction, the first installment being payable upon completion of the foundations and delivery of rough lumber, the last 35 days after filing of the completion notice. The first of the five construction disbursements would be used in part to credit the borrower's liability for a 3 per cent loan fee charged by West Coast.

The nominal borrower was Northampton Builders, Inc., a corporation owned by Parker and his wife and entirely controlled by Parker. The president of Northampton Builders was Parker's sales manager, Chester Sutter. On January 18,

1961, the master agreements and the individual deeds of trust were signed. According to their later testimony, at the time the loan was negotiated both Joseph and Parker believed that the loan money would be used for actual construction of 29 houses.

On January 23 West Coast issued checks to the title company covering the release money of $1,150 per lot. On January 24 Parker came to Joseph's office and handed the latter a sheet of paper. It was entirely in Parker's handwriting. It bore the designation "Highlands Estates No. 2," was labeled "1st payments" and specified the lot numbers of all 29 lots in the subdivision. Joseph wrote "O.K." on the paper, initialed it and entered the date. The paper thus became authority for disbursement of the first of the five construction installments which, by the written agreement, was to be paid out upon completion of the house foundations. On the strength of this authorization, West Coast's disbursing employees issued checks aggregating $64,806.57. Of this amount, $42,200 was paid to the title company to pay off the balance owed to the original landowner and $22,606.57 was paid to Parker's firm, Northampton Builders.

At the time West Coast issued the checks covering the first construction disbursement, Joseph had not visited the subdivision site and had no knowledge of the stage of construction, if any. Shortly after the first disbursement he visited the site. No start on construction had been made. In later testimony Joseph stated that he was shocked to discover that fact.

On January 26 and 27 Parker was in Los Angeles in connection with the Manley negotiations. He learned that Manley's trust deed operations had collapsed and no financing would be available to him from that source. Parker's insolvency was now acute. On January 30, in Sacramento, he reviewed his situation with Joseph and William F. McCormick, a vice president of West Coast. Joseph decided that it would be expedient to advance Parker the remaining four installments of the construction loan on Highlands Estates No. 2 even though Parker was not proceeding with construction and would use the money to stave off creditors rather than to build the houses which were to have served as West Coast's loan security. According to Joseph's later testimony, it was expedient to make the loan disbursements to protect West Coast's security from the threat of builders' liens and to prevent Parker's bankruptcy.

Accordingly, on various dates thereafter, Parker submitted documents calling for payment to him of the four remaining loan installments and indicating, according to the loan agreements, that the specified stages of construction had been reached. Although the total amount of the 29 loans was paid out by West Coast, not a speck of concrete was poured nor a stud nailed in place at Highlands Estates No. 2. Except as indicated above, the loan money was used by Parker for current business expenses and to appease some of his creditors. There was testimony at the trial that the members of West Coast's Sacramento board of directors were quite unaware of the situation. Parker's business affairs eventually culminated in his bankruptcy.

Defendant first argues insufficiency of the evidence to sustain the verdict. ▆ Conviction of theft for obtaining property by false pretenses must rest on proof of these essential elements: (1) that the defendant made a false pretense or representation, (2) that the representation was made with intent to defraud the owner of his property, and (3) that the owner was in fact defrauded in that he parted with his property in reliance upon the representation. (*Perry* v. *Superior Court,* 57 Cal.2d 276, 282-283 [19 Cal.Rptr. 1, 368 P.2d 529].) By its verdict the jury found that Parker had made false representations with intent to defraud and that West Coast had relied on these representations in parting with the loan money. ▆ Defendant's appellate attack is concentrated on asserted lack of reliance. His theory is that the evidence demonstrates West Coast's awareness, through Joseph, its president-manager, of the false statements on which the money was disbursed; that this imputed awareness forecloses reliance. By parity of reasoning he attacks the following portion of a jury instruction given by the trial court: "If an officer of a building and loan association orders disbursement of illegal payments under a loan agreement, the association is not charged with knowledge of his actions, nor is it bound by his actions as a matter of law."

In discussing the legal significance of Joseph's state of mind, we do not overlook evidence tending to show that at the time Parker requested the first construction disbursement, Joseph had no awareness of his failure to start construction. Parker's own testimony indicates that when the loan was arranged, both he and Joseph intended the actual development of Highland Estates No. 2. Parker testified: "To save this subdivision, we needed houses." He stated that the loan

was "the plan we mutually worked out to save the land;" that after payment of preliminary expenses, the loan money was to be used "to build the houses. . . . This is at the time we agreed to carry out the project." Such was the pattern formed before the shattering news of Manley's collapse. Even if West Coast were chargeable in law with Joseph's knowledge of the false statements upon which the later loan disbursements were made, the evidence justifies a finding of Joseph's unawareness of falsity when the first construction money was advanced. Thus, even if Joseph's knowledge were imputed to his employer, there is substantial evidence to support the conviction so far as it rests upon theft of the initial construction disbursement, amounting to $64,806.57.

A corporation, of course, can acquire knowledge only through its officers and agents. ▋ Generally, the knowledge of a corporate officer within the scope of his employment is the knowledge of the corporation. (3 Fletcher, Cyclopedia of Corporations (1965 rev.) §§ 789-790; 13 Cal.Jur.2d, Corporations, § 340, p. 112.) ▋ "Where the president of a corporation is also its general manager, having the power to superintend and conduct its business, he has implied authority to make any contract or to do any other act appropriate in the ordinary course of its business. In such case, his powers are greater than he would have as president alone." (*Memorial Hospital Assn.* v. *Pacific Grape etc. Co.*, 45 Cal.2d 634, 637 [290 P.2d 481, 50 A.L.R.2d 442].) On the other hand, an officer's knowledge is not imputed to the corporation when he has no authority to bind the corporation relative to the fact or matter within his knowledge. (*Moore* v. *Phillips,* 176 Cal.App.2d 702, 709 [1 Cal.Rptr. 508]; 3 Fletcher, *op. cit.,* §§ 793-796.) "An agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals, to be a fraud upon the principal." (Civ. Code, § 2306.) ▋ A corporation is not chargeable with the knowledge of an officer who collaborates with an outsider to defraud it. (*First Nat. Bank* v. *Reed,* 198 Cal. 252, 259 [244 P. 368]; *Bourne* v. *Root,* 125 Cal.App. 461, 464 [13 P.2d 1066]; 3 Fletcher, *op. cit.,* § 826.)

Such rules are part of the body of the law of agency and of corporations, developed for specific application in civil litigation. These rules rest largely on presumptions and on probabilities of conduct. (See *Palo Alto etc. Assn.* v. *First Nat. Bank,* 33 Cal.App. 214, 224-225 [164 P. 1124].) Yet, with care, they are adaptable to criminal adjudication. Indeed, the doc-

trine of corporate knowledge firmly supports and closely parallels *ad hominem* comment on the facts at hand. ■ As president-manager of West Coast, Joseph had broad authority to assess credit risks and evaluate security. Joseph testified that he was under great pressure from his "top people" to get money out on loan. To all appearances, few if any limitations emanated from the directors of West Coast Savings and Loan Association, from the parent concern in Los Angeles or from the federal deposit insurance agency. The depositor was apparently a forgotten man. The freewheeling atmosphere enveloping this branch of the banking business in an era and locale of enormous housing expansion could not but create the impression that the rules of the game were quite flexible. Joseph's implied authority to bind his employer was capacious indeed.

Broad though the horizon, it was nevertheless finite. Parker was no tyro in the field of construction credits. His testimony evinces a sophisticated knowledge of the subject. He knew that Joseph was not running a one-man show, that Joseph was actually the entrusted agent of West Coast's depositor-investors. As West Coast's largest credit consumer, he could not but know that savings and loan associations could not make unsecured loans.[1] Parker's wholly owned firm had executed master agreements, calling for prompt construction of houses, for use of loan funds for the exclusive purpose of construction (except as specifically provided) and for disbursement at specified stages of construction.[2] Completed homes, not bare soil, were the intended security. Parker professes no belief in

---

[1] See Financial Code section 7102.

[2] The master agreements provided in part: "Each of the undersigned, jointly and severally, further agree as follows:

"1. To complete the proposed improvements to be constructed on said property promptly, in accordance with plans and specifications approved or to be approved by the Association.

". . . . . . . . . . . .

"5. All of the monies of the said account except as otherwise provided, are to be disbursed by the Association subject to the provisions of this agreement, in order to provide funds for the construction of said improvements, and may be paid at any time or times to the undersigned, or to any of them, or at the option of the Association, to the contractors and/or material-men and/or laborers engaged in such construction, or at the election of the Association at such times as such construction has, to the satisfaction of the Association, reached the following stages in accordance with said plans and specifications:

"(a) . . . . . . . . . . . .

"(b) The undersigned agree, if required by the Association, to furnish receipted bills and releases of lien rights covering work done and/or material furnished for the said improvements showing the expenditure of an amount equal to the total of funds at such time disbursed from

Joseph's authority to advance money on phantom houses. So crude, so blatant a breach overran even the broad reaches of apparent authority established by existent business habits and mores. In thus misusing his position, Joseph was not acting for his employer and Parker knew or had reason to know it. Joseph's knowledge of Parker's falsification cannot as a matter of law be attributed to the corporation.

Parallels are supplied by several California decisions upholding fraud convictions where an official or employee of the victimized firm cooperated in thievery. (*People* v. *Wynn*, 44 Cal.App.2d 723 [112 P.2d 979]; *People* v. *Zimmer*, 23 Cal. App.2d 581 [73 P.2d 923].) A portion of the *Zimmer* opinion is quite apropos here: "Appellant is not aided by the argument that certain employees of the Hollywood State Bank had knowledge concerning the value of the checks. Defendants are not charged with issuing the checks with the intent to defraud the corrupt employees but rather they are charged with issuing checks with intent to defraud the banks. The corrupted employees with the knowledge of defendants, were falsifying the records of the Hollywood State Bank and concealing from its officers the facts concerning the transaction with defendants. They had no authority to defraud the bank." (*People* v. *Zimmer, supra*, 23 Cal.App.2d at pp. 584-585.)

Thus the evidence is not, as a matter of law, inconsistent

said account, including the then requested payment, and the Association shall be authorized to act upon and shall be fully protected by, the written order or receipt of any one of the undersigned in making any advances and/or payments and/or in any other matter arising from this agreement. The undersigned, and each of them, agree that all funds received hereunder are receiv*d* in trust for the purpose of paying in full all contractors and/or materialmen and/or laborers (other than the undersigned) then or theretofore engaged in said construction; and that the undersigned shall not have any beneficial interest in said funds unless and until said purpose has been fulfilled.

"(c) In the event work should cease on improvements, specifically including stoppage by the Association in accordance with paragraph 6 hereof, or for any reason whatsoever, for fifteen (15) days, the same shall be construed as an event of default hereunder.

"6. The Association or its agents shall have the right at all times to enter upon said premises during the period of construction, and if said work is not in conformance with said plans or specifications or is not otherwise satisfactory to said Association, it shall have the right to stop said work and order its replacing whether or not said unsatisfactory work has theretofore been incorporated in said improvements, and to withhold all disbursements from said account until said work is satisfactory to it; and if the said work is not made satisfactory to the Association within fifteen (15) days from the date of stoppage by the Association, such failure to do so shall constitute a default by the undersigned under the terms of this agreement."

with the jury's finding that West Coast relied upon Parker's false representations upon which the four last loan disbursements were withdrawn. Parker asserts that the accomplice's testimony is not supported by the corroborating proof required by Penal Code section 1111.[3] ■ The reviewing court examines the evidence to determine whether the corroboration required by statute has been proved; the weight to be given such evidence is for the jury. (*People* v. *Ashley*, 42 Cal.2d 246, 267 [267 P.2d 271].)

■ Corroborating evidence is sufficient if it tends to connect the defendant with the commission of the offense in such a way as may reasonably satisfy the jury that the accomplice-witness is telling the truth. (*People* v. *MacEwing*, 45 Cal.2d 218, 224 [288 P.2d 257], and cases cited; see *People* v. *Pearl*, 211 Cal.App.2d 783, 790-791 [27 Cal.Rptr. 664].)

■ Evidence other than Joseph's testimony included the master agreements, calling for construction disbursements when specified stages of construction had been reached; written memoranda emanating from Parker or those under his control requesting these disbursements and impliedly representing that the respective stages of construction had been accomplished; Parker's own testimony that the memoranda requesting the first and second construction disbursements were entirely in his own handwriting; Parker's admission on the witness stand that in fact "nobody had done any work over there;" West Coast's checks constituting the loan disbursements and bearing the endorsement of Parker's corporation, Northampton Builders. We need not carry our evidentiary account further, because the enumerated items solidly connected Parker with the crime and abundantly corroborated the testimony of Joseph, the accomplice.

A related contention is the prosecution's asserted failure to meet the requirements of Penal Code section 1110.[4] ■ On five occasions false pretenses were expressed in writing, ema-

---

[3]Penal Code section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

[4]Penal Code section 1110 provides in part: "Upon a trial for having, with an intent to cheat or defraud another designedly, by any false pretense, . . . obtained from any person any . . . money . . ., the defendant cannot be convicted if the false pretense was expressed in lan-

nating either from Parker personally or from persons under his orders. These statements were intended to represent that certain stages of construction had been reached and were designed to be accepted as representations on the strength of which Parker would receive money. Two of these statements were in the handwriting of the accused. Two witnesses, Joseph and Parker, identified these documentary pretenses. The testimony of Joseph was fully corroborated. The statutory cup was more than filled; it overflowed.

Error is assigned in instructions which left the jury to determine whether Joseph was an accomplice. ■■■ ''If the undisputed evidence establishes that a witness is an accomplice, the jury should be so instructed, but if the facts as to complicity are in dispute, the question should be left to the jury.'' (*People* v. *Santo,* 43 Cal.2d 319, 326 [273 P.2d 249]; *People* v. *Aadland,* 193 Cal.App.2d 584, 588-589 [14 Cal.Rptr. 462].) ■■ There was no doubt of Joseph's complicity. The absence of an instruction telling the jury that Joseph was an accomplice as a matter of law was not prejudicial error, however, since the corroborating evidence was ample in quality and quantity. (See *People* v. *Franklin,* 194 Cal. App.2d 23, 32 [14 Cal.Rptr. 375].) There is no reasonable probability that the instruction would have resulted in a defense verdict, hence absence of the instruction is not cause for reversal. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

Finally, defendant urges that the trial court erroneously restricted his trial counsel's *voir dire* examination of jurors. In commencing jury impanelment the trial court read Penal Code section 1096 to the prospective jurors, inquired as to their willingness to comply with the court's instructions on presumption of innocence and reasonable doubt and as to their willingness to give both sides a fair and impartial trial. At a later stage defense counsel requested that he be permitted to ask prospective jurors a series of five questions which we note in the footnote.[5] The court rejected the request on two

guage unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof is in writing, subscribed by or in the handwriting of the defendant, or unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances; . . .''

[5]The questions which counsel desired to pose to the panel members were as follows:

''1. 'If, after having heard this case, you should have a reasonable

98

grounds: (a) that the questions were repetitious of those already asked by the court and (b) would unduly prolong the impanelment proceeding.

In regulating the *voir dire* examination the trial judge was under the necessity of reconciling his obligation to expedite the trial with the statutory direction to permit counsel "reasonable examination of prospective jurors." (Pen. Code, § 1078.) Like many other trial judges he sought to avoid the tedious, irksome and time-wasting prolongation of individual questioning of individual jurors by one side and then the other through resort to the progressive and accepted device of collective "preinstruction." (See Witkin, Cal. Crim. Procedure (1963) § 408, p. 408.)     Trial judges' jury instructions on legal principles eliminate any right of counsel to insist on inquiry into prospective jurors' knowledge or ignorance of legal questions. (*People* v. *Love,* 53 Cal.2d 843, 852 [3 Cal.Rptr. 665, 350 P.2d 705]; *People* v. *Harrington,* 138 Cal.App.2d Supp. 902, 903-905 [291 P.2d 584].)     On the other hand, counsel should not be stifled in detailed examination of panel members to develop possible grounds of challenge for cause (see Witkin, *op. cit.,* § 409, pp. 408-409), and under some circumstances to preclude inquiry into the jurors' *willingness* to apply legal principles may be a denial of the statutory right of reasonable examination. (*People* v. *Love, supra,* 53 Cal.2d at p. 852, fn.)

With these general rules in mind, we turn to defendant's five questions. The last three questions were designed to "educate" the jurors on the identical legal principles they had heard in the court's preinstructions and would hear again in the court's formal instructions. Twenty-eight talesmen were

doubt of the defendant's guilt, would you, notwithstanding that doubt, vote to convict him because the majority of the other jurors disagreed with you?'

"2. 'If, after having heard this case, you should have a reasonable doubt of the defendant's guilt, would you, notwithstanding that doubt, change your personal verdict merely out of desire to return to your home or your business?'

"3. 'If, after having heard this case, you should have a reasonable doubt of the defendant's guilt of the specific crime charged, but you believe him guilty of some other crime, would you, notwithstanding that doubt, vote to convict him of this charge merely because you believe he's guilty of some crime, although not charged?'

"4. 'Do you have a personal belief of the wisdom of the rule of criminal jurisprudence that a defendant in a criminal case is presumed to be innocent?'

"5. 'Do you have any personal objection to a rule of criminal jurisprudence which provides that those jurors entertaining a reasonable doubt of the defendant's guilt should vote for an acquittal?' "

examined in the course of jury impanelment. The court correctly denied counsel indulgence in the wearisome business of addressing these three repetitious and unnecessary questions to 28 individual jurors.

The first two questions differ somewhat from the last three. The direct import of the former is an inquiry into the jurors' willingness to pursue their duties even at the sacrifice of personal convenience. Indirectly, however, they were aimed at further "education" on the subject of reasonable doubt. The trial judge was not required to sanction by indirection what he could preclude directly. It might have been error, although not necessarily prejudicial error, to preclude counsel from some appropriate form of inquiry into the jurors' willingness to pursue their obligations. Counsel could not, however, insist on the court's accepting this line of inquiry in the particular form proposed by him. Its rejection was not error.

Judgment affirmed.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied July 2, 1965.