[No. C039132. Third Dist. Oct. 9, 2003.]

LYUDMILA SHEYKO et al., Plaintiffs and Appellants, v.
RITA SAENZ, as Director, etc., et al., Defendants and Appellants.

COUNSEL

Legal Services of Northern California, Stephen E. Goldberg, John F. Gianola; Coalition of California Welfare Rights Organizations, Grace A. Galligher; and Cynthia Anderson-Barker for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Charlton G. Holland, III, Assistant Attorney General, Frank S. Furtek and Theodore Garelis, Deputy Attorneys General, for Defendants and Appellants.

OPINION

**MORRISON, J.**—This case involves regulations issued by the California Department of Social Services (Department) implementing the Statewide Fingerprint Imaging System (SFIS) mandated by the Legislature. (Welf. & Inst. Code, § 10830; further unspecified section references are to this code.) The Legislature required the Department to develop a system of electronic fingerprint imaging of welfare applicants and recipients, to try to reduce endemic fraud. The Department implemented the legislation by adopting regulations in its Manual of Policy and Procedures (hereafter, Regulations). Plaintiffs (collectively, Sheyko) sued to stop certain aspects of the system as adopted, claiming the Department's regulations exceeded statutory authority. The trial court ruled partly in Sheyko's favor and issued a writ of mandate

commanding the Department to refrain from certain practices, amend regulations and notify county welfare departments about the judgment. The Department appealed, and Sheyko cross-appealed to pursue those of her claims which the trial court rejected.

The Department has refined its case for the appeal. The trial court was not provided with the same arguments provided to this court. We conclude Sheyko fails to show the Department's regulations exceed statutory authority and we will reverse with directions to enter judgment for the Department.

In particular, we conclude as follows:

(1) It is for the Legislature to determine whether a particular welfare antifraud measure is or is not effective, therefore Sheyko's assertions that SFIS is ineffective should be addressed to the Legislature, not the judiciary.

(2) Sheyko's underlying assertions that her privacy or religious freedoms are improperly impaired by SFIS lack merit.

(3) Because SFIS creates an eligibility requirement, we reject Sheyko's assertion that it impermissibly deters persons from applying for aid and therefore undermines the Department's duty to maximize aid to all *eligible* recipients.

(4) The trial court correctly concluded that a person who applies for aid on behalf of another person is an "applicant" as defined by departmental regulations.

(5) The trial court correctly concluded that the Department may not require nonapplicant, nonrecipient adults to be finger imaged in Food Stamp cases, but because the parties agree the Department does not require this, the judgment, to the extent it requires the Department to stop doing something it does not do, and concedes it cannot do, must be reversed.

(6) The Department may require all parents, legal guardians and caretaker relatives living in a CalWORKs household to comply with SFIS, even if some of these people are not themselves eligible for CalWORKs benefits in a given case.

(7) The trial court correctly concluded that the Department may require the taking of *photographs*, in addition to finger images, as part of the SFIS program.

(8) The trial court correctly concluded the Department may require that all members of an aid group are deemed ineligible when any member who must comply with SFIS does not comply.

(9) There is no material distinction between a person's "refusal" or "failure" to comply with SFIS: Because of the ease of compliance and the many chances to comply before aid is cut off, persons will not be cut off by innocently missing a couple of SFIS appointments, and when a person persistently fails to comply, he or she may be deemed to have refused to comply. Further, because SFIS compliance is an eligibility requirement, a person who has not complied is not yet eligible for aid.

(10) The SFIS regulations do not have an impermissible retroactive effect on persons who were applicants before SFIS was enacted but who are not themselves recipients of aid.

## I. INTRODUCTION.

Counties must "relieve" the needy, if necessary by general relief. (§ 17000; *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 991 [90 Cal.Rptr.2d 236, 987 P.2d 705]; *Mooney v. Pickett* (1971) 4 Cal.3d 669, 676 [94 Cal.Rptr. 279, 483 P.2d 1231]; see *Arenas v. San Diego County Bd. of Supervisors* (2001) 93 Cal.App.4th 210, 215–217 [112 Cal.Rptr.2d 845] *(Arenas)*. Two federal-state programs provide other relief through counties: (1) the Food Stamp Act of 1964 (FSA) and (2) Temporary Assistance for Needy Families (TANF), or CalWORKs (California Work Opportunity and Responsibility to Kids, formerly Aid to Families with Dependent Children [AFDC]). The Department administers these programs. (§ 10600; *Fry v. Saenz* (2002) 98 Cal.App.4th 256, 259–260 [120 Cal.Rptr.2d 30] CalWORKs *(Fry)*; *Aktar v. Anderson* (1997) 58 Cal.App.4th 1166, 1174 [68 Cal.Rptr.2d 595] [FSA] *(Aktar)*.)

### A. FOOD STAMPS.

"The Food Stamp Program was created by the Food Stamp Act of 1964, 7 U.S.C. § 2011 et seq. The purpose . . . was to maintain adequate levels of nutrition and to strengthen the nation's agricultural economy. [Citations.] The Program is jointly administered by the federal and state governments." *(Aiken v. Obledo* (E.D.Cal. 1977) 442 F.Supp. 628, 633; see Annot., Food Stamp Eligibility (1994) 118 A.L.R.Fed. 473, 485, § 2.) The FSA speaks of "participation by households" (7 U.S.C. § 2014(b)) and eligibility "is determined on a household, rather than an individual, basis." (Annot., Food Stamp Eligibility, *supra*, 118 A.L.R.Fed. at p. 485, § 2, fns. omitted; see *Lyng v. Castillo* (1986) 477 U.S. 635, 636 [91 L.Ed.2d 527, 531, 106 S.Ct. 2727].)

California maximizes its participation in the program by statute: "The eligibility of households shall be determined to the extent permitted by federal law." (§ 18901; see *Aiken v. Obledo, supra*, 442 F.Supp. at p. 636.) A federal statute partly defines "Household" to mean "(A) an individual who

lives alone or who, while living with others, customarily purchases food and prepares meals . . . separate and apart from the others, or (B) a group of individuals who live together and customarily purchase food and prepare meals together . . . ." (7 U.S.C. § 2012(i); see 7 C.F.R. § 273.1; Regs., § 63-402.) The FSA uses the "household" definition to reduce fraudulent claims, e.g., claims by multiple members of one "household." (*Steinberg v. U.S. Dept. of Agriculture* (E.D.N.Y. 1984) 613 F.Supp. 432, 433–435.)

## B. CalWORKs.

"CalWORKs provides aid and services to families with related children under 18 whose parent or parents cannot support them due to death, incapacity, incarceration, unemployment, or continued absence from the home." (*Fry, supra,* 98 Cal.App.4th at p. 260; see *Arenas, supra,* 93 Cal.App.4th at p. 213 [discussing federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996, known as the Welfare Reform Act].)

As we recently observed, CalWORKs reflects the legislative judgment that " 'the family unit is of fundamental importance to society in nurturing its members, passing on values, averting potential social problems, and providing the secure structure in which citizens live out their lives. Each family unit has the right and responsibility to provide its own economic security by full participation in the work force to the extent possible. . . . ' (§ 11205.) With these aims in mind, '[e]very county . . . shall administer [CalWORKs] in such a manner as to achieve the greatest possible reduction of dependency and to promote the rehabilitation of recipients.' " (*Fry, supra,* at pp. 265–266; see *Vaessen v. Woods* (1984) 35 Cal.3d 749, 755 [200 Cal.Rptr. 893, 677 P.2d 1183].) TANF contains a similar statement of purpose. (*Fry, supra,* 98 Cal.App.4th at p. 266, fn. 5; see *Dozier v. Williams County Soc. Serv. Bd.* (1999) 1999 ND 240 [603 N.W.2d 493, 495].)

In like manner as FSA is granted to "households," CalWORKs aid is "granted . . . to *families* with related children under the age of 18 years" as specified and with exceptions not here relevant. (§ 11250, italics added; see *County of San Diego v. Lamb* (1998) 63 Cal.App.4th 845, 848–849 [73 Cal.Rptr.2d 912] (*Lamb*); § 11450 ["Aid shall be paid for each needy family . . . ."].) The federal purpose "is to increase the flexibility of States in operating a program designed to—(1) provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives; (2) end the dependence of needy parents on government benefits . . . ; (3) prevent and reduce [out-of wedlock pregnancies]; (4) encourage the formation and maintenance of two-parent families." (42 U.S.C. § 601; see *Mitchell v. Swoap* (1973) 35 Cal.App.3d 879, 884 [113 Cal.Rptr. 75] [construing prior analogous statutory language; " 'The very title of the program, the repeated

references to families . . . and the words of the preamble . . . show that Congress wished to help children through the family structure. . . . From its inception the Act has defined "dependent child" in part by reference to *the relatives with whom the child lives*,' " (quoting *Dandridge v. Williams* (1970) 397 U.S. 471, 479 [25 L.Ed.2d 491, 498, 90 S.Ct. 1153]). In some sense it may be said that "[t]he reference point of the statute is the deprived child" (*Hypolite v. Carleson* (1973) 32 Cal.App.3d 979, 983–984 [108 Cal.Rptr. 751]; see *Lamb, supra*, 63 Cal.App.4th at p. 849) inasmuch as families without eligible children are not eligible. (Cf. *Fry, supra*, 98 Cal.App.4th at pp. 263–264, 120 Cal. Rptr2d 30; see *Darces v. Woods* (1984) 35 Cal.3d 871, 881 [201 Cal.Rptr. 807, 679 P.2d 458] ["under usual circumstances, the AFDC family unit will consist of at least two categories of individuals: the dependent child and the caretaker relative"] (*Darces*).) But the focus is on the family, as the new name (Temporary Assistance for Needy *Families*) suggests. (See, e.g., CalWorks Manual (Western Center on Law & Poverty, www.wclp.org) ch. 2(A) (CalWorks Manual) ["CalWORKs aid . . . is not available to every person who happens to be poor, or even to every poor family with children. It is a program for poor families who also meet certain other requirements"].)

Like the FSA aids *households* rather than *individuals*, CalWORKs aids *families*. Accordingly, to determine needs-based eligibility, "The income of the natural or adoptive parent, and the spouse of the natural or adoptive parent, and the sibling of an eligible child, living in the same home with an eligible child shall be considered available, in addition to the income of an applicant for or recipient of aid under [AFDC] for purposes of eligibility determination and grant computation." (§ 11008.14; see Regs., §§ 40-118.1–.2.) These family members comprise the CalWORKS "filing unit," "the group of persons required to be on the Statement of Facts," (SAWS 2) (Regs., §§ 80-301(f)(1), 40-115.22), which is filled out at the time of the initial application (SAWS 1) and yearly reapplications.

An "applicant" is "a person who requests aid or a person on whose behalf a request for aid is made." (Regs., § 80-301(a)(7).) "An [AFDC] application is a request for aid in writing made to the county welfare department on the SAWS 1 either by the applicant or on his or her behalf." (Regs., § 40-103.4.) An AFDC "recipient" is "a person who is receiving AFDC." (Regs., § 80-301(r)(1).) "A person becomes a 'recipient' on the date on which both of the following conditions are met: [¶] 1. *the person meets all conditions of eligibility*, and [¶] 2. the county [approves the application]." (Ibid., italics added.)

C. STATEWIDE FINGERPRINT IMAGING SYSTEM (SFIS).

Some people seek more relief than they are entitled to by using different identities in their county or by applying for relief in more than one county. To

prevent this type of welfare fraud, some states fingerprint recipients each time they collect benefits. Many recipients laud such antifraud efforts, which can restore integrity to the welfare system and increase benefits for those who need help. (See Luna, *Welfare Fraud and the Fourth Amendment* (1997) 24 Pepperdine L.Rev. 1235, 1250; see Note, *Welfare Policy* (1995) 109 Harv.L.Rev. 1168, 1170–1173.)

Biometric identification is described in *Finger Imaging: A 21st Century Solution to Welfare Fraud at our Fingertips* (1995) 22 Fordham Urb. L.J. 1327, at pages 1333–1335 (*Finger Imaging*): "Finger imaging is part of a field of science called biometrics. Biometrics involves the scanning or recording of some unique personal characteristic, . . . against a verified database for positive identification. . . . In finger imaging, the technology converts a fingerprint into a highly detailed and exact electronic image that a computer can interpret and compare to other images. . . . [¶] . . . .

"To begin the finger imaging process, each individual places his/her right and left index fingers on the scanning device so that the software may convert the minutiae of the finger into a numeric algorithm for storage and matching purposes. The scanner generates a digitized print and triggers a computerized photograph of the client that is easily and instantly available for reference and indicates whether the client is currently receiving public assistance within the scope of the database or has applied anywhere else within the scope of the database. A positive match indicates . . . that the client is already in the system and insures that the applicant is denied a duplicate check. [Fns. omitted.]"

The impetus for the SFIS legislation and regulations is reflected in documents Sheyko submitted to the trial court. In a "Final Statement of Reasons" the Department explained how it developed antifraud identification measures to "[restore] integrity to welfare programs in California." A pilot program in Los Angeles County reportedly proved successful (Comment, *Automated Fingerprint Identification Systems: Issues And Options Surrounding Their Use To Prevent Welfare Fraud* (1995) 59 Alb. L.Rev. 399, 400), and section 10830 was passed. The Department partly stated photographs would help "resolve [discrepancies] and ensure the integrity of the match results. The [program] is consistent with the [TANF] State Plan which contains a certification that the state has established standards and procedures to ensure against program fraud and abuse."

The Legislature saw fit to enact two sections each numbered 10830 in the Welfare and Institutions Code, one in chapter 4.2 (Stats. 1997, ch. 627, § 2) which we disregard here because it relates to an entirely different subject, and the one at issue, in chapter 4.6 (Stats. 1996, ch. 206, § 1.5). Our reference to section 10830 refers to the latter.

Section 10830 provides in part as follows: "(a) The department . . . shall design, implement, and maintain a statewide fingerprint imaging system for use in connection with the determination of eligibility for [FSA and AFDC benefits, but not foster care benefits].

"(b)(1) Every applicant for, or recipient of, aid under [AFDC or FSA], other than dependent children or persons who are physically unable to be fingerprint imaged, shall, as a condition of eligibility for assistance, be required to be fingerprint imaged.

"(2) A person subject to the requirements of paragraph (1) shall not be eligible for [AFDC or FSA] until fingerprint images are provided, except as provided in subdivision (e). Ineligibility may extend to an entire case of any person who refuses to provide fingerprint images.

"(c) The department may adopt emergency regulations to implement this section . . . .

"(d) All persons required to be fingerprint imaged pursuant to this section shall be informed that fingerprint images obtained pursuant to this section shall be used only for the purpose of verifying eligibility and preventing multiple enrollments in [AFDC or FSA]. The department, county welfare agencies, and all others shall not use or disclose the data collected and maintained for any purpose other than the prevention or prosecution of fraud. Fingerprint imaging information . . . shall be confidential . . . .

"(e)(1) Except as provided in paragraph (2), the fingerprint imaging required under this chapter shall be scheduled only during the application appointment or other regularly scheduled appointments. No other special appointment shall be required. No otherwise eligible individual shall be ineligible to receive benefits under this chapter due to any technical problem occurring in the fingerprint imaging system or as long as the person consents to and is available for fingerprint imaging at a mutually agreed upon time, not later than 60 days from the initial attempt to complete fingerprint imaging.

"(2) During the first nine months following implementation, recipients may be scheduled for separate appointments to complete the fingerprint imaging required by this section. Notice shall be mailed . . . to recipients at least 10 days prior to the appointment, and shall include procedures for the recipient to reschedule the scheduled appointment within 30 days.

"(f) If the fingerprint image of an applicant or recipient of aid to which this section applies matches another fingerprint image on file, the county shall

notify the applicant or recipient. In the event that a match is appealed, the fingerprint image match shall be verified . . . prior to the denial of benefits. . . ."

We here emphasize two provisions: (1) the Department must implement a fingerprint imaging "system"; and (2) compliance is "a condition of eligibility" for "[e]very applicant for, or recipient of, aid" except dependent children and those physically unable to comply. (§ 10830, subds. (a) & (b)(1).)

"As a condition of eligibility, persons listed in Section 40-105.32 must supply through the SFIS two fingerprint images and a photo image at the time of application. Failure to provide the required images will result in ineligibility for the entire assistance unit [AU]." (Regs., § 40-105.31.) The following must comply if physically able: (1) each parent or caretaker relative "of an aided or applicant child when living in the home of the child"; (2) each parent or caretaker relative "receiving or applying for aid on the basis of an unaided excluded child"; (3) each aided or applicant adult; and (4) the "aided or applicant pregnant woman in an AU consisting of the woman only." (Regs., § 40-105.324.) The data is confidential and used to and only to prevent fraud. (Regs., § 40-105.34.)

The record shows the Department provides for emergency aid (CalWORKs "Immediate Need" or FSA "Expedited Service" or both) and only those individuals who apply in person have to comply with SFIS before such emergency aid is given.

## II. Standard of Review.

Whether the statute supports the regulations presents a question of law, reviewed de novo. (*Fry, supra*, 98 Cal.App.4th at p. 262; *Arenas, supra*, 93 Cal.App.4th at pp. 214–215.)

Sheyko must show the regulations are invalid. (*Tomlinson v. Qualcomm, Inc.* (2002) 97 Cal.App.4th 934, 940–941 [118 Cal.Rptr.2d 822].) Because of the agency's expertise, its view of a statute or regulation it enforces is entitled to great weight unless clearly erroneous or unauthorized. (See *Californians for Political Reform Foundation v. Fair Political Practices Com.* (1998) 61 Cal.App.4th 472, 484 [71 Cal.Rptr.2d 606].) Where the Legislature sets policy and fixes standards, the agency may " 'fill up the details' " via regulations. (*Physicians & Surgeons Laboratories, Inc. v. Department of Health Services* (1992) 6 Cal.App.4th 968, 982 [8 Cal.Rptr.2d 565].)

As we recently summarized (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 108–109

(fns. omitted)): "Government Code section 11342.2 [states 'no] regulation adopted is valid or effective unless [1] consistent and not in conflict with the statute and [2] reasonably necessary to effectuate the purpose of the statute.'

"[First,] the judiciary independently reviews the administrative regulation for consistency with controlling law. The question is whether the regulation alters or amends the governing statute or case law, or enlarges or impairs its scope. . . . This is a question particularly suited for the judiciary as the final arbiter of the law, and does not invade the technical expertise of the agency.

"[Second, reasonable necessity] generally does implicate the agency's expertise; therefore, it receives a much more deferential standard of review. The question is whether the agency's action was arbitrary, capricious, or without reasonable or rational basis."

■ A regulation may interpret or make specific a statutory scheme, but it cannot impede the force of the statute. (*Caldo Oil Co. v. State Water Resources Control Bd.* (1996) 44 Cal.App.4th 1821, 1827 [52 Cal.Rptr.2d 609] (*Caldo*).) We do not defer to the Department about whether its regulations lie within the scope of authority delegated by statute. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

The Department partly defends SFIS by pointing out that TANF requires California to assure the federal government that it has a fraud detection system in place. (See 42 U.S.C. § 602(a)(6); 7 U.S.C. § 2020(e)(22); 7 C.F.R. § 272.4(e)(1) (2003).) But TANF and FSA allow states to tailor rules within the bounds of federal law (see *Aiken v. Obledo, supra,* 442 F.Supp. at p. 636 [FSA]; *Daniels v. McMahon* (1992) 4 Cal.App.4th 48, 51–52 [5 Cal.Rptr.2d 404] [AFDC] (*Daniels*)) and federal approval of the SFIS regulations would not amend section 10830. (See *Caldo, supra,* 44 Cal.App.4th at pp. 1829–1831.) ■ In other words, federal approval of state regulations does not make the regulations valid under the state law, i.e., consistent with the state enabling statutes.

## III. Background Contentions

The appellate briefs touch on three points invoked earlier in the case. We discuss these points to provide background to the points explicitly headed and argued on appeal.

### A. Effectiveness of SFIS.

Pointing to newspaper articles and the like, Sheyko asserts the SFIS statutory scheme results in a net monetary loss and deters the needy from

seeking benefits. (See, e.g., Sacramento Bee (Jan. 21, 2003) *Fingerprint Failure*, p. B6.) She claims many immigrants fear compliance will result in persecution and therefore will not apply for benefits which their children need. But, as is typical with social policy issues, there are contrary studies which indicate such programs can be fair and efficient. (See *Finger Imaging*, *supra*, 22 Fordham Urb. L.J. at pp. 1331, 1361–1362.) The record shows the United States Department of Agriculture, the body with oversight over the FSA, stated in a written Administrative Notice (No. 96-13) that it believes "Matching fingerimages can be a useful method to prevent an individual from participating more than one time in a given month by using more than one identity."

■ These competing policy views illustrate why the judiciary is not in the best position to craft efficient relief laws. That onerous task is "properly resolved on the other side of Tenth Street, in the halls of the Legislature." (*Osborn v. Hertz Corp.* (1988) 205 Cal.App.3d 703, 711 [252 Cal.Rptr. 613] [it is the Legislature, not the judiciary, that possesses the power to make laws].) Our job is to review "the legality of the regulations [and statutes], not their wisdom." (*Morris v. Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697].)

### B. PRIVACY AND RELIGIOUS FREEDOM.

Sheyko views finger imaging as an invasion of privacy and personal dignity, and invokes the specter of 1984. But the Legislature could rationally find welfare recipients are no more stigmatized by fingerimaging than are driver's license applicants, lawyers, accountants and many others. (See *Automated Fingerprint Identification Systems*, *supra*, 59 Alb. L.Rev. at pp. 403–409; *Finger Imaging*, *supra*, 22 Fordham Urb. L.J. at pp. 1334–1335, 1345–1346.)

Sheyko pleaded that fingerprint imaging "is a mark of the devil and stains the soul with sin." But the United States Supreme Court has rejected religious freedom objections to the use of social security numbers to reduce welfare fraud: "No one can doubt that preventing fraud in these benefits programs [AFDC and FSA] is an important goal." (*Bowen v. Roy* (1986) 476 U.S. 693, 709 [90 L.Ed.2d 735, 751, 106 S.Ct. 2147]. And the California Supreme Court has rejected privacy claims about the use of fingerprinting for driver's licenses, again, because of the need to deter fraud. (*Perkey v. Department of Motor Vehicles* (1986) 42 Cal.3d 185, 190–191 [228 Cal.Rptr. 169, 721 P.2d 50].) The New York courts have rejected the claim that a relief applicant may refuse to give fingerimages on religious grounds. (*Matter of Medvedev v. Wing* (1998) 671 N.Y.S.2d 806 [249 App.Div.2d 755]; *Matter of Buchanan v. Wing* (1997) 664 N.Y.S.2d 865 [245 App.Div.2d 634] (*Buchanan*).) Based on the above authorities, so do we.

### C. Weakening the Safety Net.

Sheyko suggests that to the extent fingerimaging deters any eligible person to apply for aid, the Department undermines its duty to provide aid to the needy. For example, the Department must administer assistance in a way which will achieve program purposes without violating the privacy or dignity of applicants. (§ 10500; Regs., § 40-101.1.) A similar claim was rejected in New York, where the state constitution requires providing for the needy: "Since petitioners cannot be classified as needy until such time as they are finger imaged to determine whether they are receiving duplicate benefits, no violation of this constitutional provision has been stated." (*Buchanan, supra,* 664 N.Y.S.2d at p. 867 [245 App.Div.2d at pp. 636–637].) In New York, as in California, finger imaging is a condition of eligibility. (*Id.* at p. 867, fn. 3 [245 App.Div.2d at p. 636]; see § 10830, subd. (b)(1).) Hortatory commands that the Department maximize aid cannot override explicit *limitations* on aid. As stated in the context of pension legislation, which must be liberally construed, a court cannot "eradicate the clear language and purpose of the statute and allow eligibility for those for whom it was obviously not intended." (*Neeley v. Board of Retirement* (1974) 36 Cal.App.3d 815, 822 [111 Cal.Rptr. 841].)

### IV. Discussion

The trial court issued a detailed written decision. ■ Although we review the trial court's ruling, and not its reasoning (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216 [70 Cal.Rptr.2d 745]), we find it helpful to address each point with reference to the trial court's decision.

### A. "Applicant for . . . aid."

The trial court found that a person who applies on behalf of another person is an "applicant" as follows: "The court concludes that the phrase 'applicant for . . . aid' in . . . section 10830, subdivision (b)(1) is reasonably and logically construed to include a person who applies for aid on behalf of a dependent, minor or otherwise incompetent recipient. A minor child does not request aid on his or her own. Therefore the request must be filed by a parent or caretaker. The person who requests the aid is an applicant, as well as the child for whom a request for aid is made is an applicant. 'To apply' is to make a formal request; it is the same even though the recipient is someone else."

We agree. Non-SFIS regulations define an "applicant" as "a person who requests aid or a person on whose behalf a request for aid is made." (Regs., § 80-301(a)(7).) ■ To "apply" generally means to "make a formal

request or petition, usually in writing" (Black's Law Dict. (6th ed. 1990) p. 99, col. 1) and, hence, the person filling out the form is an "applicant."

Sheyko points to another regulation by which the Department defines an "application" for CalWORKs as "a request for aid . . . either by the applicant or on his or her behalf." (Regs., § 40-103.4.) Because this section distinguishes between "the applicant" and the person applying "on his or her behalf," Sheyko reasons that the person filing the application is not an applicant. Although this regulation draws the posited distinction, it does not change the definition of "applicant" as "a person who requests aid or a person on whose behalf a request for aid is made." (Regs., § 80-301(a)(7).) Sheyko's proposed definition would mean that no parent in a child-only-eligible family would be an applicant, opening a loophole for fraud.

The SFIS regulation pertaining to FSA only cases states: "Authorized representatives are not required to comply with [SFIS] unless no household member . . . is required or able to comply . . . ." (Regs., § 63-601.14.) Sheyko reasons that because "authorized representative" is not used in section 10830, the regulation lacks support. She faults the Department for instructing county welfare offices in an all county letter to treat ineligible parents in FSA-only cases as de facto authorized representatives: "[Q.] For FS only cases where the only eligible household member is a minor, who is required to comply with [SFIS]? [A.] [Regulations section ] 63-601.12 requires 'eligible' adult household members to [comply.] However, if the eligible FS household does not contain adult members and there is no designated authorized representative, an excluded parent or step-parent, applying on behalf of the minor child(ren), should be fingerprint/photo imaged as the [de facto] authorized representative for the minor child(ren) in the household under [Regulations section] 63-601.14."

In Sheyko's view, "By this sleight of hand, [the Department] has changed a regulation which forbids applying SFIS to ineligible parents in Food Stamp[-]only cases to a directive that mandates applying SFIS to ineligible parents." But, as the trial court concluded, an " 'applicant for . . . aid' . . . is reasonably and logically construed to include a person who applies for aid on behalf of a dependent, minor or otherwise incompetent recipient. A minor child does not request aid on his or her own." In Food Stamp-only cases, even if the parent is ineligible, by requesting foodstamps for the child, the *ineligible* parent is an *applicant.*

Sheyko also contends the trial court wrongly treated ineligible parents and caretaker relatives to be "recipients," because a "recipient" is, e.g., "a person who is receiving AFDC" and ineligible persons cannot receive benefits. (Regs., § 80-301(r)(1).) Parents or legal caretakers of children who receive aid also "receive" aid. Parents have a duty to care for minor children.

(Fam. Code, § 3900; Regs., § 43-105.) So do legal caretakers, who eponymously have the legal duty to care for the children in their charge. (See Regs., § 80-301(c)(1)(A) & (B) [caretaker lives with child in filing unit and "Exercises responsibility for the day-to-day care and control of the child"]; see *Darces, supra,* 35 Cal.3d at p. 896 (conc. opn. of Kaus, J.); 45 C.F.R. § 233.90(c)(5)(B) (2003).) We agree with the Department that to the extent the government aids the children, it relieves parents and caretakers of their obligations. (See *County of San Luis Obispo v. Nathaniel J.* (1996) 50 Cal.App.4th 842, 844–846 [57 Cal.Rptr.2d 843]; *County of Shasta v. Caruthers* (1995) 31 Cal.App.4th 1838, 1841 [38 Cal.Rptr.2d 18].) Moreover, parents and caretakers literally *receive* the aid to be expended on behalf of children. Children cannot negotiate relief checks or receive food stamps on their own.

Foreign cases cited by Sheyko shed no light on these California rules. (See *Solman v. Shapiro* (D.Conn. 1969) 300 F.Supp. 409, 414, affd. *sub nom. Shapiro v. Solman* (1969) 396 U.S. 5 [24 L.Ed.2d 5, 90 S.Ct. 25] [interplay of federal and Connecticut laws]; *State, Dept. of Institution, Social & Rehabilitative Services v. Brown* (Okla. 1975) 532 P.2d 839, 842 [Oklahoma disability statute].)

### B. OTHER ADULTS.

The trial court amplified its conclusion regarding who qualifies as an applicant as follows: "The court does not expand this construction to other persons in the home who are not recipients of aid. Other persons in the home do not have to be fingerprinted and photographed unless they are recipients of aid or applicants for aid under the interpretation the court has approved."

The *judgment* requires the Department "To refrain from requiring that parents and caretaker relatives who are not applying for or receiving [aid] for themselves be finger imaged and photo imaged as a condition of eligibility for benefits for other members of the family when another parent or caretaker relative in the family is applying for or receiving [aid] and has been finger imaged and photo imaged."

This portion of the judgment requires a separate analysis of its impact on FSA and CalWORKs cases.

### 1. MULTIPLE ADULTS IN FSA CASES.

The Department states it does not require more than one adult in child-only FSA cases to be fingerimaged: "If the parents are not themselves eligible for aid, and the dependent children are eligible for, and form a, Food Stamp

household, but are not eligible for CalWORKs cash aid, regulations require that only one adult authorized representative in the household be imaged." The Department cites Regulations sections 63-601.14 and 63-402.612. The latter states that an authorized representative may be designated to obtain benefits, and the former states that "Authorized representatives are not required to comply with SFIS requirements, unless no household member" can comply. The Department argues the trial court should not have ordered it to refrain from requiring more than one adult to be imaged in such cases, because it does not do so. The Department also states it does not require more than one nonparent caretaker relative to comply where those relatives do not themselves apply for or receive CalWORKs or FSA aid, referring to Regulations section 82-808.5: "If there is a spouse or other relative other than the designated non parent caretaker relative of the eligible child in the home, that other person is not subject to the imaging requirement. Only the designated non-parent caretaker relative must be imaged."

Sheyko agrees that the Department cannot require more than one adult to be imaged in these cases. She argues that because the Department was unclear on this point at trial, this court "should affirm . . . to require [the Department] to clearly inform its county agents of its actual policy."

This opinion memorializes the Department's interpretation of its duties. (See *Haley v. L. A. County Flood Control Dist.* (1959) 172 Cal.App.2d 285, 292–294 [342 P.2d 476].) ■ We see no reason to uphold part of a judgment ordering an agency to stop doing what it has not done and concedes it cannot do. That would validate an advisory opinion on an abstract question, rather than adjudicate a ripe controversy. (See *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170–173 [188 Cal.Rptr. 104, 655 P.2d 306].)

## 2. MULTIPLE ADULTS IN CalWORKs CASES.

Sheyko agrees that where both parents in the household are eligible for CalWORKs benefits, both must comply, and where both are ineligible, one or the other must comply. She argues that where an eligible parent has applied on behalf of the child, an ineligible parent need not comply with SFIS. The Department argues that all parents and their spouses in the CalWORKs filing unit, "the group of persons required to be on the Statement of Facts" (Regs., §§ 80-301(f)(1), 40-115.22), must be imaged. Sheyko first claims that this argument about the filing unit was not raised in the trial court. ■ But the argument presents a question of law, resolution of which is a matter of statewide importance, therefore we will address it. (*See & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 [194 Cal.Rptr. 357, 668 P.2d 664]; *Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].)

Sheyko next claims the filing unit argument depends on new evidence which she might have countered in the trial court. ■ The Department relies on published regulations of which we must take judicial notice. (Evid. Code, § 451, subd. (b); see *In-Home Supportive Services v. Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 720, 725, fn. 2 [199 Cal.Rptr. 697].) The Department also points to the application and related aid forms, which are themselves indexed as regulations and are available on request from the Department. (Regs., §§ 63-1200, 63-1211; see *Kings Rehabilitation Center, Inc. v. Premo* (1999) 69 Cal.App.4th 215 [81 Cal.Rptr.2d 406] [incorporation by reference permissible under the Administrative Procedures Act] (*Kings*).) We reject the claim that the Department's argument unfairly hinges on new, untested, *facts*.

As stated above, section 11008.14 provides in part that the income of specified persons must be considered in making the eligibility determination for CalWORKs, specifically, parents, stepparents and siblings living in the home of the eligible child. (See also Regs., §§ 40-118.1, 80-301(f)(1).)

Under general Department regulations, when applying for aid and each year thereafter an applicant must fill out a "Statement of Facts" or "SAWS 2" form. (See Regs., § 40-115.22.) Both parents in the CalWORKs family must be included on the form. (Regs., § 40-118.13.) As we explain later, aid recipients must file monthly forms used to redetermine eligibility, and those forms "shall be signed by each natural or adoptive parent or aided spouse of a parent or other caretaker relative living in the home [unless temporarily absent]." (Regs. § 40-181.241(c).) The CA 7 monthly form—as revised *before* section 10830 was adopted—required the signatures of "cash-aided parent or caretaker relative" and "cash-aided spouse or other parent of cash-aided children." The current form has different wording, but still requires the "spouse or other parent of cash aided child(ren)" to sign in addition to the primary applicant. Because each parent or spouse living in the home must *sign* the forms, each is an "applicant" and must comply with SFIS. Sheyko claims only "counted" income is important, and points out some income is not counted. (See, e.g., Regs., § 44-133.22 [income of parent on SSI not imputed to the filing unit].) However, the regulations require that "All net income of persons included in the Assistance Unit is income to the Assistance Unit." (Regs., § 44-133.1.) Section 11450 partly provides that "In determining the amount of aid paid . . . the family's income [with exemptions] shall be deducted from the sum specified" in a table, which is adjusted periodically. (See *California Homeless & Housing Coalition v. Anderson* (1995) 31 Cal.App.4th 450, 453–455 [37 Cal.Rptr.2d 639].) The fact that some income may not be counted does not change the fact that the Department must ascertain the filing unit's income, which it can do only if the unit's members properly report that income by filling out the forms and verifying the accuracy thereof by signing them.

The Department "does not take the position that every adult in the home is required to be imaged. There may be relatives or other adults living in the home who are neither parents, legal·guardians, nor caretaker relatives who are not mandatorialy included in the Filing Unit. Because their income is not considered for purposes of eligibility determination and grant computations, they are not members of the CalWORKs Filing Unit, are neither recipients of aid nor applicants for aid and are thus not required to be imaged." But we agree with the Department that persons who are part of the filing unit are effectively recipients of aid and must be fingerimaged. As stated above, aid is granted to the family and therefore benefits all members of that family unit, even if some members would not be eligible if considered individually.

Sheyko argues: "The fact that an adult in the household must have his or her income counted does not mean that such an adult is an 'applicant' or 'recipient.'" Pointing to the format of the Statement of Facts (SAWS 2) which applicants must fill out, she argues that a second parent who is not applying for personal benefits need not sign the form and therefore he or she is not an applicant. She also claims that because the Legislature did not use the term "filing unit" in section 10830, it did not intend to require all members of the filing unit to comply with SFIS.

■ Taking the latter point first, it is an established rule of construction that laws are to be read in the context of related laws. (See *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, ·755 P.2d 299]; *Cossack v. City of Los Angeles* (1974) 11 Cal.3d 726, 732–733 [114 Cal.Rptr. 460, 523 P.2d 260].) Sheyko concedes that the Legislature is presumed to be aware of the relief laws and pre-SFIS regulations when it adopted section 10830. Section 11008.14 was in effect before the SFIS statute, as was the CA 7 form. (See Stats. 1981–1982, 1st Ex. Sess., ch. 3, § 6, p. 6893.)

As to the former point, because the income of persons in the filing unit must be considered, we reject Sheyko's view that such persons have the option of refusing to sign the form and thereby evade the SFIS rules, while still obtaining benefits for their family unit. That would undermine the statutory purpose of section 10830. Instead, such a person must sign the forms, thereby becoming an applicant, and is effectively a recipient as a member of the filing unit, triggering the duty to comply with SFIS. We agree with the Department that all adult members of the CalWORKs filing unit must comply with SFIS. It appears Sheyko's argument rests partly on a misinterpretation of the forms. The second line for signatures on the SAWS 2 states it is for the "other parent living in the home if applying for cash aid," which Sheyko interprets to apply to a second parent who is applying for cash aid *for herself or himself.* We disagree. The forms are designed to enable

applicants to seek FSA, CalWORKs and other types of aid (e.g., Medi-Cal), therefore some boxes are relevant only in certain cases. This signature line, read in context, refers to a second parent living in the home where *the application* seeks cash aid, whether or not that second parent is eligible individually.

Because the judgment requires the Department to refrain from insisting on SFIS compliance by all adult members of the filing unit, that portion of the judgment is incorrect.

## C. PHOTOGRAPHS.

The trial court upheld a regulation authorizing facial photographs, finding it reasonably related to the SFIS purpose. We reject Sheyko's attack on this conclusion.

The statute nowhere *prohibits* photographs, and we reject Sheyko's view that the failure to mention photographs means the Legislature wanted to prohibit photographs. (See *Kings*, *supra*, 69 Cal.App.4th at p. 218 ["The fact that no statute explicitly authorizes the practice . . . does not mean it is illegal"].)

Sheyko posits a parade of horribles: What if the Department required "blood testing, DNA sampling, urine testing" along with fingerimaging? The Legislature required the Department to adopt "a statewide fingerprint imaging system." (§ 10830, subd. (a).) By requiring adoption of a *system*, the Legislature conferred discretion on the Department to use its expertise to evaluate and adopt a system which it could feasibly integrate into its existing operations. Taking a photograph is not invasive, and available fingerimaging systems include taking a photograph of the subject. (*Finger Imaging*, *supra*, 22 Fordham Urb. L.J. at pp. 1333–1335.) The record shows that the system offered to the State by the outside vendor came with photo-imaging, that photo-imaging does not add to the time or invasiveness of the procedure, and that it is efficient and effective in helping case workers administer the antifraud system. Sheyko has not carried her burden to show the adoption of a system which includes the taking of a photograph exceeded statutory authority or constituted an abuse of discretion by the Department.

## D. ENTIRE CASE INELIGIBILITY.

The trial court upheld the Department's regulations which require that all members of an aid group are deemed ineligible when a member who must comply with SFIS does not: "The court concludes that a 'full family' sanction for refusal of an applicant for aid, as interpreted by the court, or recipient of

aid, to be fingerprint and photo imaged does not violate the law. The person who applies for aid on behalf of the household or minor or otherwise incompetent person vouches for the accuracy of the information provided. It is appropriate and necessary that respondents be able to detect fraud in the application process. Imposing the 'full family' sanction is an important means of insuring the effectiveness and integrity of the system."

The trial court then narrowed this holding by distinguishing between a "refusal" and "failure" to comply, which we discuss later. Sheyko introduced the term "full family sanction" in the trial court, and views the Department's action in such cases as a penalty. The characterization of disqualification as a penalty may be accurate in some contexts. (E.g., Conn. Gen. Stat. Ann. § 17b-112(e)(3) (West 2003) ["a disqualification penalty shall be established for failure to cooperate with the biometric identification system"]; see *Walton v. Hammons* (6th Cir. 1999) 192 F.3d 590, 595–597 [using term "sanction" in FSA context] (*Walton*).) However, regarding the California laws, the Department says "[i]t is misleading to refer to an eligibility factor as a 'sanction' because the word 'sanction' implies that [the Department], as a punitive measure, is withholding benefits due to an eligible recipient. Such is not the case—in this context, persons who are not in compliance with the imaging requirement are not eligible for, and do not receive, benefits. Accordingly, the imaging requirement is not a sanction."

 We agree that it is not accurate to equate ineligibility with a sanction, or penalty, because section 10830 makes compliance a condition of eligibility. Further, the word sanction is inherently ambiguous because it can mean *approval* or *penalty*. (See Black's Law Dict., *supra*, p. 1341, col. 1; Garner, Modern Legal Usage (2d ed. 1995) pp. 780–781.) Accordingly, we will not use the term "sanction" in this case.

The statute provides: "A person subject to the [SFIS] requirements . . . shall not be eligible for [aid] until fingerprint images are provided, except as provided in subdivision (e) [pertaining to scheduling appointments]. *Ineligibility may extend to an entire case of any person who refuses to provide fingerprint images.*" (§ 10830, subd. (b)(2), italics added.) Sheyko points out the section uses both "shall" and "may": Because the Legislature stated the noncompliant person "shall" not be eligible but ineligibility "may" extend to the entire case, Sheyko argues individualized (case-by-case) discretion must be exercised. Sheyko points to other instances of program noncompliance which may result in a less severe result are of no assistance. For example, she points out that only the family member who fails to provide a social security number, or fails to meet welfare-to-work requirements, loses benefits. (Regs., §§ 42-721.43, 63-404.41.) But, as the Department points out, those factors, which may be requirements of aid, are not conditions of eligibility, as is SFIS compliance.

Generally speaking, " 'Shall' is mandatory and 'may' is permissive." (§ 15; see *Department of Social Welfare v. Wingo* (1946) 77 Cal.App.2d 316, 319 [175 P.2d 262].) But the meaning of "shall" and "may" must be considered in light of the statutory purpose. (See *Bradley v. Lacy* (1997) 53 Cal.App.4th 883, 889–890 [61 Cal.Rptr.2d 919]; *Governing Board v. Felt* (1976) 55 Cal.App.3d 156, 161–162 [127 Cal.Rptr. 381].)

The use of "may" shows the Legislature intended that the Department exercise discretion in determining how noncompliance by one person would impact others under the law. (See *Caldo, supra,* 44 Cal.App.4th at p. 1831–1832 ["The use in the statute of the directory phrase stating the Board 'may' pay up to the ceiling does not confer . . . the arbitrary power to pay or disallow claims; its discretion is delimited by the statutory scheme"]; accord *Allison v. Block* (8th Cir. 1983) 723 F.2d 631, 634–638 [because statute allowed agency to grant stated relief, using "may," agency had to develop standards for doing so].)

The Legislature did not mandate case-by-case discretion. The Department exercised its discretion by adopting regulations mandating "ineligibility for the entire assistance unit" in cases of "[f]ailure to provide the required images" for CalWORKs purposes. (Regs., §§ 40-105.31, 40-171.221k ["action shall be taken to deny aid if . . . any person required to provide fingerprint and photo images refuses or otherwise fails"].) The Department adopted an FSA regulation requiring "each eligible household member" to comply (Regs., § 63-601.12), and the parties agree the effect is the same, because if any member does not comply, the household is ineligible.

We agree with the trial court that the Department could rationally conclude that any other result than "entire case" ineligibility would undermine the effectiveness of the system.

As for the FSA, the United States Department of Agriculture addressed this issue in a directive dated March 25, 1996, which we find illuminating and persuasive: "Consistent with . . . A[dministrative] N[otice] 96-13, *an entire household may not participate until all required household members have cooperated by providing fingerimages.* As the requirement to provide fingerimages is part of the eligibility determination process through its detection of duplicate participation, the provision in section 6(c) of the [FSA] would apply. This provision states that 'No household shall be eligible . . . if it refuses to cooperate in providing information to the State agency that is necessary for making a determination of its eligibility or for completing any subsequent review of its eligibility.' "

As stated elsewhere, there is an administrative hearing before benefits are denied or terminated, at which the issue of refusal to cooperate can

be made. Once that determination is made, the FSA household is no longer eligible. There is no law allowing the provision of food stamps except to eligible *households*. Once the *household* is ineligible because of the refusal of a required member to cooperate with SFIS, its other members are ineligible unless or until they form a new "household" or until the errant member complies. In this respect, the "entire case" ineligibility was foreordained, at least as to the FSA, which provides aid to and only to eligible "households."

As for CalWORKs, the Department could rationally conclude there was no reason to adopt a more lenient rule, allowing a filing unit to receive benefits while a member failed to comply with SFIS: As the trial court concluded, that would open the door to fraud, frustrating the statutory purpose.

E. REFUSAL AND FAILURE TO COMPLY.

Section 10830, subdivision (b)(2) provides in part that "Ineligibility may extend to an entire case of any person who *refuses to provide* fingerprint images." (Italics added.) By regulation, "*Failure to provide* the required images will result in ineligibility[.]" (Regs., § 40-105.31, italics added; see Regs., § 40-171.221k ["refuses or otherwise fails"].)

The trial court limited the ambit of the entire case ineligibility by drawing a distinction between "refusal" and "failure" to comply with SFIS: "Respondents, in their most recent brief, state that the Manual of Policies and Procedures, section 40-126.3 (a regulation which allows a 'cure' period for a failure to cooperate but not for a refusal to cooperate), may apply but is not expressly applicable or inapplicable to SFIS. However, respondents have adopted regulations and instructions to counties which are expressly and specifically applicable to SFIS and which do not distinguish between a failure and a refusal to comply with the fingerprint and photo imaging requirements. [Citations.] As respondents have adopted regulations and policies which allow a 'full family' sanction [*sic*] for a failure to comply, they are unauthorized in that . . . section 10830 provides that '[i]neligibility may extend to an entire case of any person who refuses to provide fingerprint images' but does not authorize that sanction [*sic*] for a mere failure to comply."

The judgment requires the Department "To refrain from denying or terminating benefits for the entire case of an applicant or recipient of CalWORKs [or] Food Stamps for a failure to comply with the [program] requirements as opposed to a refusal to comply with these requirements." We conclude that there was no basis to make this distinction. Because of the availability of a fair hearing which delays the impact of the eligibility determination for a sufficient period to allow multiple opportunities to comply with SFIS, we reject Sheyko's hypothetical of an innocent applicant or recipient who

through mischance failed to comply with SFIS despite reasonable efforts to comply. Once a person has repeatedly passed up reasonable opportunties to comply, it is rational for the Department to conclude that person's "failure" to comply equates to a "refusal" to comply. Therefore, the regulations speaking of a failure or refusal to comply do not exceed the terms of the statute which speaks only of a refusal to comply.

Generally, "there need not be a 'wilful' refusal to comply with welfare rules and regulations before aid can be reduced." (*Berlin v. McMahon* (1994) 26 Cal.App.4th 66, 73.) Here, lack of compliance with SFIS means a person has not satisfied a *condition of eligibility*. (§ 10830, subd. (a).) The Department states: "An applicant or recipient who fails to comply with [SFIS] is not eligible for benefits, whether the refusal stems from an express refusal to comply or a failure to comply. Ultimately, there is no real difference between someone who refuses to comply and someone who fails to comply—neither is eligible for benefits." We generally agree.

All persons who must be imaged are told the purpose of the SFIS program and assured the data will be used for and only for fraud detection. (§ 10830, subd. (d).) Imaging is scheduled during the normal application appointment "or other regularly scheduled appointments. No other special appointment shall be required." (*Id.*, subd. (e)(1).) Technical problems are not counted against a person, "as long as the person consents to and is available for fingerprint imaging at a mutually agreed upon time, not later than 60 days from the initial attempt to complete fingerprint imaging." (*Ibid.*) Special appointments for SFIS compliance are authorized during and only during the initial nine months of the program implementation, and those appointments are set by mailed notice, which "shall include procedures for the recipient to reschedule the scheduled appointment within 30 days." (*Id.*, subd. (e)(2).) The record contains undisputed evidence that SFIS compliance "is only one of many required steps in the determination of eligibility and takes less than five minutes for the applicant to complete while in the office." (See also Biometric ID Project, at www.dss.state.ct.us [describing Connecticut's similar program].)

Sheyko does not seriously dispute that compliance is easy, but argues this is irrelevant because "[r]egardless of the ease of compliance, it is certainly possible for people to innocently fail to comply with SFIS." She posits innocently missed appointments, and points out that for the FSA, federal law requires "a clear determination of refusal to cooperate," as stated in the directive from the Department of Agriculture we partly quoted above: "Per the program regulations at 7 [C.F.R. § ] 273.2(d)(1), a clear determination of refusal to cooperate would need to be made before terminating or denying the household, and a household terminated as such would be permitted to

reapply, but could not be determined eligible 'until it cooperates with the State agency.' " We find that innocent failure to comply will not result in denial of benefits or loss of aid, as we now explain in some detail.

■ Aid recipients may not be cut off without a fair hearing, and aid is continued pending the outcome. (*Goldberg v. Kelly* (1970) 397 U.S. 254, 264–265 [25 L.Ed.2d 287, 296–297, 90 S.Ct. 1011].) The Department acknowledges that SFIS noncompliance does not obviate fair hearing rights. Sheyko states this remedy is illusory because "the family would automatically lose." Not so: At such a hearing, a person could explain efforts to comply (e.g., multiple technical failures of SFIS equipment) or, more simply, comply on the spot or in the sometimes lengthy period leading up to the hearing. An "All County Letter" (No. 00-32) from the Department, cited by Sheyko, states in part "Counties are encouraged to fingerprint/photo image clients whenever they are in the office to take care of other business unless there is some physical impairment that precludes imaging." Because benefits would continue until an adverse hearing decision, compliance at or before the hearing would forestall any loss of benefits. Indeed, as we now explain in greater detail, the fair hearing process would take a person much longer than SFIS compliance.

■ The fair hearing regulations require that the county mail notice of ineligibility or reduction of aid. (Regs., §§ 22-072.1, 40-107.5.) Generally, the aggrieved party has 90 days after the adverse action to demand a hearing (§ 10951) but requesting a hearing before the effective date of the adverse action ensures that aid is "paid pending" the hearing. (*Daniels, supra,* 4 Cal.App.4th at p. 52.) The Department has a duty to help the applicant comply and "shall not deny an application" if he or she is cooperating in good faith. (Regs., § 40-126.34; see CalWorks Manual, *supra,* ch. XIV(c); see also *Webb v. Swoap* (1974) 40 Cal.App.3d 191, 193–194 [114 Cal.Rptr. 897] [generally describing fair hearing procedures], distinguished on another ground in *Aktar, supra,* 58 Cal.App.4th at p. 1178.) The aggrieved party can ultimately seek review by the Department's director, or the courts. (See §§ 10959–10962.)

Because of these fair hearing procedures, a person who simply missed a couple of SFIS appointments would not lose aid: At any point along the process the person could visit a welfare office and comply with SFIS, mooting the eligibility flaw. The Department could rationally conclude that anybody who persistently fails to comply with SFIS has *refused* to comply.

Contrary to Sheyko's claim, the fact the Department has adopted separate form notices for noncompliance depending on whether a person "failed" to comply or "told us" the person would not comply, does not mean the

Department "expects county workers to decide in each case whether noncompliance with SFIS is a failure or a refusal." The Department eschews use of a case-by-case review. Non-SFIS regulations provide the county shall not deny aid "for failure to provide evidence of eligibility if the county has determined that the applicant is continuing to cooperate," but "A denial due to failure to cooperate shall be made when a presumption of noncooperation has been established by the county but an act of refusal has not occurred." (Regs., §§ 40-126.34, 40-126.341.) Such "an act of refusal" must be documented. The denial must be rescinded if the needed evidence of eligibility is produced in 30 days, and a notice to that effect must tell the applicant of this opportunity. (Regs., § 40-126.342.) However, those provisions "shall not apply to applications which are denied based on the applicant's refusal to cooperate pursuant to Section 40-157.3." (Regs., § 40-126.344; see CalWORKs Manual, *supra*, ch. 10(B)(3) ["The CalWORKs family is required to cooperate *within its capabilities*"].) Regulations section 40-157.3 provides for denial of an application where the applicant "is able to assist . . . but refuses," and "a denial based on refusal to cooperate shall only be made as the result of the applicant's active refusal either orally or in writing to cooperate in the investigation of eligibility." (Regs., § 40-126.344(a).) When an FSA household is shown to "have been able to cooperate, and clearly demonstrated that it chose not to take such actions as are required to complete the application process," the application is denied, but "If there is any question as to whether the household has merely failed to cooperate, as opposed to refused to cooperate, the household shall not be denied." (Regs., § 63-505.121 (a) & (b).) This tracks federal FSA law, referred to in the Department of Agriculture directive quoted above. "The [FSA] household shall also be determined ineligible if it refuses to cooperate in any subsequent review of its eligibility . . . ." (Regs., § 63-505.123.) Refusal-to-cooperate rules also apply in TANF cases. (See, e.g., *Walton, supra*, 192 F.3d 590; *Tomas v. Rubin* (9th Cir. 1991) 926 F.2d 906, 908–909, clarified on rehearing at 935 F.2d 1555.) But we agree with the Department that where a person persistently fails to comply, an inference of refusal to comply properly follows.

At bottom, whether a party has *failed to establish* eligibility or *refused to establish* eligibility, that party has *not established eligibility* and, hence, cannot be given aid: The Department may not grant aid until a party has demonstrated legal eligibility for aid. Section 10830 does not depart from this basic truth. The trial court erred by requiring the Department to consider the mental state of noncompliant persons. Instead, we agree with the Department: "A person who remains out-of-compliance with the imaging requirement, and neither comes into compliance nor successfully contests a determination of ineligibility [at a fair hearing] ultimately refuses to comply with the imaging requirement. Such a person is ineligible for benefits and causes his or her entire case to also be ineligible."

### F. Retroactivity

The trial court concluded the SFIS regulations had an impermissible retroactive effect, at least in part: "[T]he fingerprint and photo imaging requirements may not be applied to persons who were 'applicants,' as that term is construed by this court, prior to the effective date of section 10830 but are not themselves 'recipients,' The two terms are not interchangeable. If the requirements were extended to persons who applied prior to the effective date of the statute but are not 'recipients,' the statute would have an impermissible retroactive effect. The statute would affect the consequences of past actions: by applying in the past, a person would now be subject to being fingerprinted and photographed. The Legislature has not clearly expressed an intention that the requirements apply to persons who applied in the past but are not themselves 'recipients.' If the Legislature wishes to make past 'applicants' subject to fingerprint and photo imaging requirements, it should do so by [explicit] legislation."

The judgment bars the Department "from requiring compliance . . . by parents and caretaker relatives who are not themselves recipients of but were applicants on or before July 21, 1996, for [CalWORKs or FSA] benefits for children with continuing eligibility who are currently receiving benefits." The trial court used the term "recipient" in the narrow sense of an eligible receipient, rather than in the sense of one who receives benefits on behalf of another.

"Absent some clear expression by the Legislature that its enactments are intended to have retroactive effect we do not generally assume retroactivity." (*Rogers v. Edmonds* (1988) 200 Cal.App.3d 1237, 1241 [248 Cal.Rptr. 15].) "A statute does not operate retroactively merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment." (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 7 [255 Cal.Rptr. 412, 767 P.2d 679].) "The test of retroactivity is whether [a statute] operates retroactively to materially alter the legal significance of a prior event. . . . The problem is to discern the materiality of events with respect to the policy advanced by the presumption of prospectivity. The source of the presumption is the 'general consensus that notice or warning of the rule should be given in advance of the actions whose effects are to be judged.' [Citation.] *Application . . . is retroactive only when it gives a different and potentially unfair legal effect to actions taken in reliance on the preenactment law.*" (*California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 609 [255 Cal.Rptr. 184], italics added (*California Trout*).)

The Legislature intended that all applicants and recipients be imaged to prevent fraud. SFIS compliance is an *eligibility* requirement (§ 10830, subd.

(b)(2)) and recipients lose their entitlement as soon as they lose their eligibility. (E.g., 7 U.S.C. § 2015(c) [household loses FSA eligibility "if it refuses to cooperate in providing information . . . that is necessary for making a determination of its eligibility or for completing any subsequent review of its eligibility"].) It would be no different than the Legislature changing some other eligibility condition, such as maximum income: That new cutoff would apply to all recipients, regardless of when they became recipients. No recipient has a reasonable expectation that eligibility conditions will not change. Nobody loses past benefits for present noncompliance with SFIS.

A person may lose eligibility for a variety of reasons (e.g., earning above a given amount). Each AFDC or FSA recipient must file a monthly report and benefits may be discontinued if it is not timely filed. (Regs. §§ 40-181.22 [AFDC], 63-505.2 [FSA], 80-310(c)(12) & (s)(7) [defining forms]; see CalWorks Manual, *supra*, ch. X(c) & (d).) The eligibility determination is reconsidered monthly and yearly. (See §§ 11265, 11265.1; Stats. 2002, ch. 1022, § 30 [quarterly option].) Sheyko contends these reports are irrelevant because they are "inherently prospective in nature, while SFIS adds a new legal requirement to an application process which has already been completed." But the monthly and yearly reporting process creates a system in which eligibility is continually reevaluated to see if the present conditions of eligibility are met. This means the SFIS regulations do not "materially alter the legal significance" of applying for benefits, nor give "a different and potentially unfair legal effect to actions taken in reliance on the preenactment law." (*California Trout, supra*, 207 Cal.App.3d at p. 609.)

Sheyko posits unfairness to people who were applicants, but not recipients, before the SFIS statute, because they must be imaged to ensure continued benefits to the recipients. But if the original applicant did not comply, the present recipient could find a new person to take responsibility for filing the monthly and yearly updates, that is, a new applicant. Because receipt of benefits depends on monthly and yearly redeterminations, recipients must always have some applicant to fill out the forms, and it does not matter whether it is the person who originally applied on their behalf. We reject Sheyko's claim of unfair retroactive application of the SFIS program.

## DISPOSITION

The judgment is reversed with directions to enter judgment for the Department. Each party shall bear its own costs on appeal. (Cal. Rules of Court, rule 27(a).)

Scotland, P. J., and Kolkey, J., concurred.